**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS INDUSTRIAL TOOLS, INC. d/b/a/ JMK/IIT, INC. and JMK SALES, INC., ) ) ) | |
| Plaintiffs, ) | CASE NO.      08 C 1544 |
| ) | |
| v. ) | JUDGE:  DARRAH |
| ) | |
| DIAMOND VISIONS, INC. and ROBERT ) W. HEINZEL, ) | MAGISTRATE JUDGE:  COX |
| ) | Trial By Jury Demanded |
| Defendants. ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
**PRELIMINARY INJUNCTION**

Plaintiffs Illinois Industrial Tools, Inc. ("Illinois Industrial Tools") d/b/a/ JMK/IIT, Inc.

and JMK Sales, Inc. ("JMK Sales") (collectively, "JMK/IIT" or "Plaintiffs") submit this

memorandum of law in support of their Motion for Preliminary Injunction against Diamond

Visions, Inc. ("Diamond Visions") and Robert W. Heinzel ("Heinzel") (collectively,

"Defendants").

## INTRODUCTION

This action arises from the intentional, willful and unlawful sale and distribution of

products by Defendants under Plaintiff's trademark in violation of the Lanham Act, 15 U.S.C.

§ 1125(a)(1), and in violation of Defendant Heinzel's Covenant Not to Compete and Amendment

to the Covenant Not to Compete with Plaintiffs (the "Agreements").  This action also arises from

intentional, willful and unlawful acts by the Defendants constituting unfair competition and trade

libel.  Defendant Heinzel was a former owner of JMK Sales, and transferred ownership of JMK

to Plaintiffs in 2002.  Defendant Heinzel has received significant and valuable consideration for

the JMK name and business.  Defendant Heinzel agreed not to compete with Plaintiffs as part of that sale.  He has broken that agreement and is using Plaintiffs' mark without authorization.

Defendant's use of Plaintiffs' trademark and violation of the Agreements pose serious harm to Plaintiffs' valuable trademark rights and goodwill and will cause incalculable losses to Plaintiffs' customer base, sales and profits.  Unless Defendants are enjoined from distributing and selling the products bearing Plaintiffs' trademark, and violating the Agreements, consumers will continue to be confused and mislead and Plaintiffs will continue to be irreparably harmed.  Injunctive relief is required to protect Plaintiffs' trademark rights, goodwill and legitimate business interests.

## BACKGROUND FACTS[1]

JMK/IIT distributes discount tools and other general merchandise across the United States to national and regional hardware chains, independent hardware stores and other retail outlets.  (Compl. ¶ 9.)  Heinzel, the owner and President of Diamond Visions, previously owned JMK Sales, Inc. and is a current employee of JMK/ITT.  (Compl. ¶¶ 12, 24.)  Diamond Visions is not an authorized JMK/IIT distributor.  (Compl. ¶ 10.)

On August 16, 2002, Illinois Industrial Tools, Inc. entered into a Stock Purchase Agreement with Robert Heinzel and his wife, Elizabeth A. Heinzel ("Heinzels"), under which Illinois Industrial Tools purchased from the Heinzels all of the common stock of JMK Sales, Inc. for two million five hundred thousand dollars ($2,500,000) plus an amount equal to the profits of JMK Sales for the calendar year 2002.  (Compl. ¶ 12, Ex. A.)

---

[1] The facts set forth herein were acknowledged and sworn to in the Verified Complaint filed in this action.  (A Copy of the Verified Complaint is attached as Ex. 1.)

1861799

Under the Stock Purchase Agreement, Illinois Industrial Tools was to pay fifty thousand dollars ($50,000) upon execution of the agreement, four hundred and fifty thousand dollars ($450,000) upon closing, three hundred thousand dollars ($300,000) within one hundred and twenty (120) days following the closing (the "Initial Sums") and the balance of the purchase price in three (3) equal annual installments including interest, as evidenced by a Promissory Note. (Compl. ¶ 13, Ex. B.)  The Heinzels agreed and understood that the Promissory Note and any payments required under the Promissory Note were subordinate to the purchase loan from JMK/IIT's bank. (Compl. ¶ 14, Ex. C and D.)  Following the purchase of JMK Sales by Illinois Industrial Tools, Inc., Illinois Industrial Tools began doing business as JMK/IIT, Inc. (Compl. ¶ 15.)

Concurrently and in conjunction with the Stock Purchase Agreement, Heinzel entered into an Employment Contract with JMK/IIT under which Heinzel was employed full-time by JMK/IIT for a three (3) year period with an option to renew for one year as the Vice President of Sales and Marketing at a salary of $16,666.67 per month plus benefits and the use of two company cars. (Compl. ¶ 16.)  Also in conjunction with the Stock Purchase Agreement, Heinzel entered into a Covenant Not to Compete with JMK/IIT under which he agreed for a five (5) year period not to "directly or indirectly manage, own or operate a business engaged in the wholesale distribution of discount tools, sunglasses, baseball hats and other 'close-out' items," the type of items distributed by JMK Sales and JMK/IIT. (Compl. ¶ 17, Ex. E.)

Following payment of the Initial Sums due and a portion of the annual installments, JMK/IIT became unable to pay the bank and the full amount due to the Heinzels under the Promissory Note. (Compl. ¶ 18.)  However, JMK/IIT continued to make the required interest payments to the Heinzels under the Promissory Note. (Compl. ¶ 18.)

In 2005, JMK/IIT and the Heinzels entered into a Debt Reduction Agreement and concurrently renegotiated Heinzel's Employment Contract and Covenant Not to Compete. (Compl. ¶ 19.)  Under the Debt Reduction Agreement, Heinzel and his wife forgave one million thirty thousand dollars ($1,030,000) of outstanding principal balance of the Promissory Note. (Compl. ¶ 20.)  In exchange, JMK/IIT sold certain of its assets to Diamond Visions and agreed to allow Heinzel, as the owner of Diamond Visions, to distribute sunglasses, reading glasses and other related novelty items, which would have otherwise violated the Covenant Not to Compete. (Compl. ¶ 21.)  Accordingly, JMK/IIT and Heinzel entered into an Amendment to the Covenant Not to Compete removing sunglasses and reading glasses from the list of items Heinzel was prohibited from distributing under the original Covenant Not to Compete so that Diamond Visions could distribute these items.  (Compl. ¶ 22, Ex. F.)  The Amendment to the Covenant Not to Compete extended the term until January 28, 2010.  (Compl. ¶ 23.)

Also in conjunction with the renegotiation, on February 2, 2005, JMK/IIT and Heinzel entered into an Amendment to the Employment Contract.  (Compl. ¶ 24.)  Under the Amendment to the Employment Contract, Heinzel remained as the Vice President of Sales and Marketing of JMK/ITT but his duties were limited to providing consulting services at a salary of $108.33 per month and benefits, as provided under the original Employment Agreement.  (Compl. ¶ 25.)

At the beginning of 2008, Plaintiffs became aware that Diamond Visions, at the direction of Heinzel, was distributing and selling discount tools and other general merchandise to national and regional hardware chains, independent hardware stores and other retail outlets in competition with JMK/IIT and in violation of the Covenants Not to Compete and his duty of loyalty under his Employment Agreement.  (Compl. ¶ 27, Ex. I.)  At the same time, Plaintiffs discovered that Defendants were selling these products under the trademark JMK/DIAMON VISIONS and

JMK-ROBERT HEINZEL, in violation of JMK/IIT's trademark rights. (Compl. ¶ 26, Exs. G and H.)

## ARGUMENT

A preliminary injunction is warranted if Plaintiffs establish: (1) a likelihood of success on the merits; (2) that they have no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied; (3) that the irreparable harm they will suffer without injunctive relief outweighs the irreparable harm that Defendants will suffer if the injunction is granted; and (4) the public interest is served by the injunction. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). The available evidence readily establishes each of these factors and weighs heavily in favor of this Court granting the preliminary injunctive relief requested by Plaintiffs.

Plaintiffs seeking a preliminary injunction need not conclusively establish their ultimate success on the merits. *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir. 1988). Instead, a "plaintiff's burden at the preliminary injunction stage is slight" and a plaintiff need only to raise a fair question as to the existence of its right to its claim and lead the trial court to believe that it would probably be entitled to such relief if its proof should sustain its allegations. *Id.* The Verified Complaint presents sufficient evidence establishing the need for a preliminary injunction in this matter. (A Copy of the Verified Complaint is attached as Ex. 1.)

## I.    Plaintiffs Will Succeed on the Merits of Their Claims.

Preliminary injunctive relief requires proof of a "reasonable likelihood" of success on the merits of the claims. *Platinum Home Mortgage Corp. v. Platinum Financial Group*, 149 F.3d 722, 726 (7th Cir. 1998).

1861799

5

Defendants are distributing and selling discount tools and other general merchandise under the JMK mark in violation of Plaintiffs' common law trademark rights and the Lanham Act, 15 U.S.C. § 1125 (a)(1). This cannot be disputed. Defendants' marketing materials clearly display the JMK mark next to Defendants' name and mark and, therefore, infringement of Plaintiffs' trademark rights by Defendants has been conclusively established. (See Compl., Ex. I). The use by Defendants of the JMK mark on these marketing materials establishes a substantial likelihood that Plaintiffs will prevail on the merits of its trademark and Lanham Act claims and is sufficient to warrant the entry of a preliminary injunction. Furthermore, additional discovery regarding this matter is not required. See, Int'l Kennel Club of Chicago, Inc., 846 F.2d at 1086 (noting that extensive discovery is not required at the preliminary injunction stage).[2]

In addition, Defendants' are distributing and selling discount tools and other general merchandise to national and regional hardware chains, independent hardware stores and other retail outlets in competition with JMK/IIT. (Compl., Exs. G, H and I). These actions are in direct violation of the Covenant Not to Compete and the Amendment to the Covenant Not to Compete, which both clearly prohibit Defendants from distributing these products (other than sunglasses and reading glasses) in competition with JMK/IIT. (Compl., Exs. E and F). This evidence establishes a substantial likelihood that Plaintiffs will prevail on the merits of their breach of contract claims.

## II.    Plaintiffs Have No Adequate Remedy at Law and Will Suffer Irreparable Harm Unless the Injunction is Granted.

In order to show no adequate remedy at law, Plaintiffs must show that money damages are inadequate. Courts readily find irreparable harm in trademark infringement cases because of

---

[2] Additional discovery would, of course, reveal the full and repeated scope of Defendants' violations of the Plaintiffs' common law trademark rights and the Lanham Act.

the victim's inability to control the nature and quality of the infringer's goods. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 (7th Cir. 1983). Indeed, "[t]he Seventh Circuit has frequently acknowledged the well-established presumption that injuries arising from Lanham Act violations are by their very nature irreparable and not susceptible to an adequate measurement for a remedy at law." *Morton Grove Pharmaceuticals, Inc. v. The National Pediculosis Association, Inc.*, 2007 U.S. Dist. LEXIS 88040 at *28 (N.D. Ill. 2007); *see also Abbott Laboratories*, 971 F.2d at 16; *Int'l Kennel Club of Chicago, Inc.*, 846 F.2d at 1091. The Seventh Circuit has also held that "[e]ven if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.'" *Int'l Kennel Club of Chicago, Inc.*, 846 F.2d at 1092 (quoting *Ideal v. Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979)). The loss of goodwill or a business's customer base justifies the entry of a preliminary injunction. *See Abbott Laboratories*, 971 F.2d at 16; *Morton Grove Pharmaceuticals, Inc.*, 2007 U.S. Dist. LEXIS 88040 at * 27-28 (N.D. Ill. 2007).

Allowing Defendants to continue to distribute and sell these products using the JMK mark will deprive JMK/IIT of control over the nature and quality of its products. Therefore, JMK/IIT will suffer substantial, incalculable damage to its goodwill and customer base. No monetary amount can adequately remedy the irreparable damage that JMK/IIT will suffer in the absence of injunctive relief.

In addition, allowing Defendants to continue to distribute and sell these products in violation of the Covenant Not to Compete and the Amendment to the Covenant Not to Compete will result in irreparable harm. "Lost profits arising from potential sales are incapable of adequate computation, and thus money damages are not an adequate remedy." *Petrzilka v.*

*Gorscak*, 199 Ill. App. 3d 120, 124-25 (Ill. App. Ct. 1990). In addition, "the loss of customers and sales and the threat of the continuation of such losses to a legitimate business interest are sufficient to show a plaintiff will suffer irreparable injury." *Id*. at 125.

Because of Heinzel's prior ownership of JMK Sales and current employment with JMK/ITT, Heinzel has knowledge of JMK/IIT's legitimate and prospective business relations with national and regional hardware chains, independent hardware stores and other retail outlets. Heinzel also has knowledge of confidential and proprietary information developed by JMK Sales and JMK/IIT, such as customer lists, and marketing and pricing strategies. This information is invaluable to JMK/IIT, provides it with a competitive advantage in the market place and could allow Defendants to negatively impact JMK/IIT's customer relationships and sales.

Furthermore, when Illinois Industrial Tools purchased JMK Sales, it agreed to do so contingent on Heinzel's agreement not to compete directly or indirectly with JMK/IIT. (Compl. ¶ 17.) Heinzel acknowledged and admitted in the Covenant Not to Compete that his ownership and management of a business involved "in the wholesale distribution of discount tools . . . baseball hats and other 'close-out' items" in competition JMK Sales could cause irreparable and continuing harm to JMK/IIT for which JMK/IIT may have no adequate remedy at law. (Compl. Ex. E, ¶ 3.) Therefore, Heinzel agreed under the Covenant Not to Compete that JMK/IIT would be "entitled to injunctive relief against [him] that enforces the convents . . . as a necessary and proper remedy." (Compl. Ex. E, ¶ 3.)

Defendants continued distribution and sale of these products in competition with JMK/IIT will deprive JMK/IIT of the benefit from its purchase of JMK Sales and result in lost customers, sales and profits. Therefore, no monetary amount can adequately remedy the irreparable damage that JMK/IIT will suffer. Hence, injunctive relief is appropriate.

1861799                                                    8

**III.    The Irreparable Harm to Plaintiffs' Goodwill, Sales and Profits Outweighs Whatever Harm Defendants May Suffer from the Enforcement of Their Own Contractual Obligations.**

The injury, existing and potential, to Plaintiffs' goodwill, reputation, customer base, sales and profits outweigh any conceivable harm to Defendants if preliminary injunctive relief is granted. The evidence clearly establishes that Defendants are distributing and selling and will continue to distribute and sell products under the JMK mark unless restrained. This evidence alone justifies preliminary injunctive relief. Defendants have no legitimate interests in the JMK mark and, therefore, will not be harmed by entry of a preliminary injunction temporarily halting their sale of products under the JMK mark. Hence, entry of the requested injunction with regard to the use of this mark will impose no hardship on Defendants.

The evidence also clearly establishes that Defendants' continuing violations of the Covenant Not to Compete and the Amendment to the Covenant Not to Compete will cause irreparable harm to Plaintiffs. Moreover, Heinzel, on behalf of himself and as President of Diamond Visions, freely and knowingly entered into the two covenants not to compete with JMK/IIT. Therefore, entry of a preliminary injunction will simply require Defendants to comply with their own contractual obligations.

**IV.    The Public Interest Favors Entry of a Preliminary Injunction Against Defendants.**

The injunctive relief that Plaintiffs seek with regard to their trademark is reasonably tailored to protect their legitimate interests in their mark and their goodwill. *See Universal City Studios v. Mueller Chemical Co.*, 1982 U.S. Dist. LEXIS 16051 at **27-28 (N.D. Ill. 1982). Furthermore, the public interest is served by granting injunctive relief to allow businesses to control the nature and quality of goods marketed to customers under their trademarks. *See Int'l Kennel Club of Chicago, Inc.*, 846 F.2d at 1092 (holding "the most corrosive and irreparable

1861799                                                    9

harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods").  Moreover, public policy favors injunctive relief because enforcement of trademark laws prevents customer confusion. *Eli Lilly & Co.*, 233 F.3d at 469; *see, also, A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir. 1982);  *Int'l Kennel Club of Chicago, Inc.*, 846 F.2d at 1092.  In addition, the public interest is served in the enforcement of valid covenants not to compete contained in lawful contracts. See *I Can't Believe It's Yogurt v. Gunn,* 1997 WL 599391 at *20 (D. Colo. April 15, 1997) (finding that the public interest is served in the enforcement of a valid covenant not to compete).

Hence, entry of a preliminary injunction will help ensure that only authentic JMK/IIT products are introduced into the market, thereby ensuring that consumers will not be confused as to the source of the products and serve the public interest by enforcing valid covenants not to compete freely negotiated and entered into by the parties.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that their motion for preliminary injunction be granted.

Dated: March 27, 2008

Respectfully submitted,

/s/ Christopher T. Sheean

Christopher T. Sheean (ARDC#6210018)
Katherine K. Ivers (ARDC#6284902)
WILDMAN, HARROLD, ALLEN & DIXON LLP
Attorneys for Plaintiffs
225 West Wacker Drive
Chicago, Illinois 60606
Telephone No. (312) 201-2000
Facsimile No. (312) 201-2555

1861799

# EXHIBIT 1

**FILED**

**MARCH 14, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS INDUSTRIAL TOOLS, INC. d/b/a/ JMK/IIT, INC. and JMK SALES, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. |
| DIAMOND VISIONS, INC. and ROBERT W. HEINZEL, | ) ) ) ) | Trial By Jury Demanded |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT

Plaintiffs, Illinois Industrial Tools, Inc. ("Illinois Industrial Tools") d/b/a/ JMK/IIT, Inc. and JMK Sales, Inc. ("JMK Sales") (collectively, "JMK/IIT"), by their attorneys, and for their Complaint against Defendants, Diamond Visions, Inc. ("Diamond Visions"), and Robert W. Heinzel ("Heinzel"), alleges as follows:

## NATURE OF THE ACTION

This action arises from Defendants' intentional, willful and unlawful sale and distribution of products by Defendants under Plaintiffs' trademark in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) and in violation of Defendant Heinzel's Covenant Not to Compete and Employment Agreement with Plaintiffs. This action also arises from intentional, willful and unlawful acts by the Defendants constituting unfair competition and trade libel. Plaintiffs seek to recover profits derived by the Defendants from their sales and distribution of the products and damages incurred by Plaintiffs resulting from the breach of the Covenant Not to Compete and Employment Agreement, along with compensatory statutory and treble damages, prejudgment interest and

**08 C 1544**

**JUDGE DARRAH**
**MAGISTRATE JUDGE COX**

attorneys' fees and costs. Plaintiffs also seek to permanently enjoin the defendants from the continued distribution of the products at issue.

## PARTIES

1.  Illinois Industrial Tools is a corporation organized and existing under the laws of the State of Illinois and having its principal place of business in Bridgeview, Illinois.

2.  JMK Sales is a corporation organized and existing under the laws of the State of Wisconsin and having its principal place of business in Oak Creek, Wisconsin.

3.  JMK Sales is wholly owned subsidiary of Illinois Industrial Tools.

4.  Diamond Visions is a corporation organized and existing under the laws of the State of Wisconsin and having its principal place of business in Oak Creek, Wisconsin.

5.  Robert W. Heinzel is an individual living in New Berlin, Wisconsin.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1367(a).

7.  This Court has personal jurisdiction over Heinzel and Diamond Visions because they are doing business in Illinois and offer products for sale in Illinois.

8.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTS COMMON TO ALL COUNTS

9.  JMK/IIT distributes discount tools and other general merchandise across the United States to national and regional hardware chains, independent hardware stores and other retail outlets.

10.  Diamond Visions is not an authorized JMK/IIT distributor.

11.  Heinzel is the owner and President of Diamond Visions.

1860447-2

## Purchase of JMK Sales, Inc. by Illinois Industrial Tools, Inc.

12.     On August 16, 2002, Illinois Industrial Tools, Inc. entered into a Stock Purchase Agreement with Robert Heinzel and his wife, Elizabeth A. Heinzel under which Illinois Industrial Tools, Inc. purchased from the Heinzels all of the common stock of JMK Sales for two million five hundred thousand dollars ($2,500,000) plus an amount equal to the profits of JMK Sales for the calendar year 2002. (A Copy of the Stock Purchase Agreement is attached as Exhibit A.)

13.     Under the Stock Purchase Agreement, Illinois Industrial Tools was to pay fifty thousand dollars ($50,000) upon execution of the agreement, four hundred and fifty thousand dollars ($450,000) upon closing, three hundred thousand dollars ($300,000) within one hundred and twenty (120) days following the closing (the "Initial Sums") and the balance of the purchase price in three (3) equal annual installments including interest, as evidenced by a Promissory Note. (A Copy of the Promissory Note is attached as Exhibit B.)

14.     The Heinzels agreed and understood that the Promissory Note and any payments required under the Promissory Note were subordinate to the purchase loan from Illinois Industrial Tools' bank. (A Copy of the Subordination Agreement is attached as Exhibit C; A Copy of the Waiver and Fifth Amendment to Loan and Security Agreement and Reaffirmation of Guaranties and Subordination Agreements is attached as Exhibit D.)

15.     Following the purchase of JMK Sales by Illinois Industrial Tools, the Illinois Industrial Tools began doing business as JMK/IIT, Inc.

16.     At the time the Stock Purchase Agreement was entered, Heinzel entered into an Employment Contract with JMK/IIT under which Heinzel was employed full-time by JMK/IIT

1860447-2

for a three year period with an option to renew for one year as the Vice President of Sales and Marketing at a salary of $16,666.67 per month plus benefits and the use of two company cars.

17.    In conjunction with the Employment Contract, Heinzel entered into a Covenant Not to Compete with JMK/IIT under which he agreed for a five (5) year period not to "directly or indirectly manage, own or operate a business engaged in the wholesale distribution of discount tools, sunglasses, baseball hats and other 'close-out' items," the type of items distributed by JMK/IIT.  (A Copy of the Covenant Not to Compete is attached as Exhibit E.)

18.    Following payment of the Initial Sums due and a portion of the annual installments, JMK/IIT became unable to pay the bank and the full amount due to the Heinzels under the Promissory Note, although JMK/IIT continues to make the required interest payments to the Heinzels.

19.    In 2005, JMK/IIT and the Heinzels entered into a Debt Reduction Agreement and renegotiated the Heinzel's Employment Contract and Covenant Not to Compete.

20.    Under the Debt Reduction Agreement, Heinzel and his wife forgave one million thirty thousand dollars ($1,030,000) of outstanding principal balance of the Promissory Note.

21.    In exchange, JMK/IIT sold certain of its assets to Diamond Visions and agreed to allow Heinzel, as the owner of Diamond Visions, to distribute sunglasses, reading glasses and other novelty items, which would have otherwise violated the Covenant Not to Compete.

22.    Accordingly, JMK/IIT and Heinzel also entered into an Amendment to the Covenant Not to Compete removing sunglasses and reading glasses from the list of items Heinzel was prohibited from distributing.  (A Copy of the Amendment to the Covenant Not to Compete is attached as Exhibit F.)

1860447-2

23.    The term of the Amendment to the Covenant Not to Compete extends until January 28, 2010.

24.    On February 2, 2005, JMK/IIT and Heinzel also entered into an Amendment to the Employment Contract.

25.    Under the Amendment to the Employment Contract, Heinzel remained as the Vice President of Sales and Marketing of JMK/ITT but his duties were limited to providing consulting services at a salary of $108.33 per month and benefits, as provided under the original Employment Agreement.

26.    On information and belief, Defendants began distributing discount tools and other general merchandise in 2007 to national and regional hardware chains, independent hardware stores and other retail outlets in competition with JMK/IIT and in violation of Heinzel's Covenant Not to Compete and his duty of loyalty under his Employment Agreement. (Copies of Diamond Visions promotional materials advertising these products are attached as Exhibit G; Copies of Diamond Visions purchase orders for these products are attached as Exhibit H.)

27.    On further information and belief, in 2007, Defendants began distributing discount tools and other general merchandise to national and regional hardware chains, independent hardware stores and other retail outlets under the name JMK/Diamond Visions in violation of JMK/IIT's trademark rights. (Copies of promotional materials showing Defendants' using the JMK mark are attached as Exhibit I.)

28.    Also in 2007, on information and belief, Heinzel began making slanderous statements regarding JMK/IIT to JMK/IIT customers by stating that JMK/IIT was in financial turmoil, involved in litigation, and going out of business.

1860447-2

## COUNT I

### Common Law Trademark Infringement

### (All Defendants)

29.    Plaintiffs incorporate the allegations of paragraphs 1-28 as if fully restated herein.

30.    Since prior to the August 16, 2002 Stock Purchase Agreement, the JMK mark was used by JMK Sales, Inc. in connection with the marketing and distribution in commerce of discount tools and other general merchandise.

31.    JMK/IIT has owned and used the JMK mark in commerce since August of 2002.

32.    JMK/IIT recently learned that Defendants are marketing and distributing in commerce similar goods using the JMK mark.

33.    Defendants' use of the JMK mark is likely to cause confusion in the marketplace about the source or origin of these goods.

34.    Upon information and belief, Defendants' use of JMK/IIT's common law mark constitutes a deliberate, willful attempt to trade on the goodwill that JMK/IIT has in its mark.

## COUNT II

### Violation of the Lanham Act
### 15 U.S.C. § 1125 (a)(1)

### (All Defendants)

35.    Plaintiffs incorporate the allegations of paragraphs 1-34 as if fully restated herein.

36.    Section 1125(a)(1)(B) of the Lanham Act provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> ....

1860447-2

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

37.     Defendants' use of the JMK mark in commerce constitutes unfair competition at common law.

38.     Defendants' use of the JMK mark is a misrepresentation of the origin of its goods and constitutes a misleading representation of fact.

## COUNT III

### Breach of Duty of Loyalty

### (Heinzel)

39.     Plaintiffs incorporate the allegations of paragraphs 1-38 as if fully restated herein.

40.     As an employee of JMK/IIT, Heinzel has breached, and continues to breach, his duty of loyalty to JMK/IIT by selling goods through Diamond Visions in direct competition with JMK/IIT.

## COUNT IV

### Breach of Covenant Not to Compete and Amendment to the Covenant Not to Compete

### (Heinzel)

41.     Plaintiffs incorporate the allegations of paragraphs 1-40 as if fully restated herein.

42.     Heinzel has breached, and continues to breach, the Covenant Not to Compete and the Amendment to the Covenant Not to Compete that he entered with JMK/IIT by owning and managing Diamond Visions and selling products through Diamond Visions in competition with JMK/IIT.

1860447-2

## COUNT V

### Violation of the Illinois Uniform Deceptive Trade Practices Act

### (All Defendants)

43.    Plaintiffs incorporate the allegations of paragraphs 1-42 as if fully restated herein.

44.    Defendants violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* by, *inter alia*, using the JMK trademark in promotional materials and, therefore, creating a likelihood of confusion or misunderstanding as to the source of Defendants' goods.

45.    In addition, Defendants violated the Illinois Uniform Deceptive Trade Practices Act by, *inter alia*, intentionally and maliciously falsely stating that JMK/IIT was in financial turmoil, involved in litigation and going out of business and, therefore, creating a question as to JMK/IIT's ability to deliver its goods.

## COUNT VI

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act

### (All Defendants)

46.    Plaintiffs incorporate the allegations of paragraphs 1-45 as if fully restated herein.

47.    Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/12 *et seq.* by, *inter alia*, using the JMK trademark in promotional materials and, therefore, creating a likelihood of confusion or misunderstanding as to the source of Defendants' goods.

48.    In addition, Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act by, *inter alia*, intentionally and maliciously falsely stating that JMK/IIT

1860447-2

was in financial turmoil, involved in litigation and going out of business and, therefore, creating a question as to JMK/IIT's ability to deliver its goods.

## COUNT VII

### Tortious Interference with Prospective Business Relations

### (All Defendants)

49.     Plaintiffs incorporate the allegations of paragraphs 1-48 as if fully restated herein.

50.     Because of Heinzel's prior ownership of JMK Sales and employment with JMK/ITT, Heinzel knew of JMK/IIT's legitimate and prospective business relations with national and regional hardware chains, independent hardware stores and other retail outlets.

51.     Heinzel, on behalf of himself and Diamond Visions, intentionally interfered with JMK/IIT's prospective business relations by falsely stating that JMK/IIT was in financial turmoil, involved in litigation and going out of business.

## COUNT VIII

### Business Defamation

### (All Defendants)

52.     Plaintiffs incorporate the allegations of paragraphs 1-51 as if fully restated herein.

53.     Defendants made statements calling into question the credibility of JMK/IIT's business by falsely stating that JMK/IIT was in financial turmoil, involved in litigation and going out of business.

WHEREFORE, JMK/IIT requests this Court to enter judgment in its favor and against Robert Heinzel and Diamond Visions, Inc. and order (a) preliminarily and permanently enjoining Heinzel and Diamond Visions from engaging in conduct that constitutes unfair competition; (b) monetary damages in an amount to be proved at trial and punitive damages; (c) disgorgement of

1860447-2

ill-gotten profits from Heinzel and Diamond Visions; (d) JMK/ITT's reasonable attorneys fees

and costs; and (e) for any such other and additional relief as the Court deems appropriate under

the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all issues triable of right by jury.

Dated: March 14, 2008

Respectfully submitted,


**/s/ Christopher T. Sheean**

Attorney for Illinois Industrial Tools, Inc. d/b/a/
JMK/IIT, Inc. and JMK Sales, Inc.

Christopher T. Sheean (ARDC#6210018)
Katherine K. Ivers (ARDC#6284902)
WILDMAN, HARROLD, ALLEN & DIXON LLP
Attorneys for Plaintiffs
225 West Wacker Drive
Chicago, Illinois 60606
Telephone No. (312) 201-2000
Facsimile No. (312) 201-25

1860447-2

## VERIFICATION

I, Lance Ericson, President of Illinois Industrial Tools, Inc. and JMK Sales, Inc., state that I have read the foregoing **Verified Complaint**, that I have made diligent inquiry into the facts and allegations contained in the **Verified Complaint** and that the same are true and correct to the best of my knowledge and belief.

_____
Lance Ericson

Subscribed and sworn to before me
this 14th day of March, 2008.

_____
Notary Public

My commission expires: 8/24/08

"OFFICIAL SEAL"
ANNE M. SCHRIEFFER
Notary Public, State of Illinois
My Commission Expires Aug. 24, 2008

1860447-2

**EXHIBIT A**

08 C 1544

JUDGE DARRAH
MAGISTRATE JUDGE COX

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated this 16th day of August, 2002, by and among **ROBERT W. HEINZEL** and **ELIZABETH A. HEINZEL** (hereinafter collectively referred to as "Shareholder"), and **ILLINOIS INDUSTRIAL TOOL, INC.**, an Illinois corporation (hereinafter referred to as "Purchaser").

WHEREAS, Shareholder desires to sell to Purchaser, and Purchaser desires to purchase from Shareholder, One Thousand (1,000) shares of the common stock (the "Stock") of JMK Sales, Inc., a Wisconsin corporation (the "Company"), which represent One Hundred percent (100%) of the issued and outstanding shares of common stock of the Company in accordance with the terms and conditions hereinafter set forth:

I.    **SALE OF SHARES**

On the terms and conditions hereinafter set forth, Shareholder shall, on the Closing Date, sell, assign, transfer, convey and deliver to Purchaser all right, title and interest in and to the Stock and Purchaser shall, on the Closing Date, purchase the Stock from Shareholder.

II.    **PURCHASE PRICE**

A.    In addition to any other amounts described in this Agreement, Purchaser shall pay to Shareholder the sum of TWO MILLION FIVE HUNDRED AND NO/00 DOLLARS ($2,500,000.00) plus or minus the amount calculated pursuant to Paragraph V hereof (the "Purchase Price") for the Stock as follows:

1.    Upon execution of this Agreement, Purchaser shall pay Shareholder by cashier's or certified check the sum of FIFTY THOUSAND AND NO/00 DOLLARS ($50,000.00).

2.    At Closing, Purchaser shall pay Shareholder by cashier's or certified check the sum of FOUR HUNDRED FIFTY THOUSAND AND NO/00 DOLLARS ($450,000.00);

3.    Within one hundred and twenty (120) days after the Closing, Purchaser shall pay Shareholder by certified or cashier's check the sum of THREE HUNDRED THOUSAND AND NO/00 DOLLARS ($300,000.00); and

4.    The balance of the Purchase Price shall be payable in three (3) equal annual installments of principal and interest based on a three (3) year amortization at an annual rate of six percent (6%) interest, which shall be evidenced by a promissory note (the "Note") in the form attached hereto as Exhibit A delivered to Shareholder at Closing. Payments shall be due on DECEMBER 31, 2003, DECEMBER 31, 2004, and DECEMBER 31, 2005.

B.    The payment of the Purchase Price and all other amounts due hereunder shall be guaranteed by CHRISTOPHER ANTHONY and JMK SALES, INC. and said guarantees shall be evidenced by Guarantees in the form attached hereto as Exhibit B and Exhibit C delivered to Shareholder at Closing.

C.    The obligations of Purchaser under this Agreement and the Note shall be secured by a pledge of the Stock and a security interest in all of the assets of Purchaser and Purchaser shall, at Closing, execute and deliver such documents as may be necessary to grant to Shareholder a security interest in the assets of Purchaser and the Stock (subject only to the security interest held by CIT), including, without limitation, a General Business Security Agreement, a Collateral Pledge

2

Agreement and the original stock certificates evidencing the Stock endorsed in blank. In addition, Purchaser shall cause the Company to grant to Shareholder a security interest in the Company's assets to secure the Company's obligations pursuant to its guarantee and shall cause the Company to execute and deliver such documents as may be necessary to grant such a security interest. Nothing herein shall require that the stock of Purchaser be pledged as security. In the event of a default by Purchaser of any of the terms of this Agreement or the Note, Shareholder may obtain the release and satisfaction of CIT's security interest in the Stock and the assets of the Company upon payment to CIT of the amount due and owing to CIT by Purchaser at such time. Purchaser hereby covenants that it shall maintain the Company as a separate entity and a going concern until Shareholder has been paid all amounts due them pursuant to this Agreement and the Note.

III.    **STOCK OPTIONS**

A.    Purchaser hereby grants to Shareholder the option to purchase the voting common stock of Purchaser at an exercise price of $.01 per share as follows:

1.    The number of shares Shareholder shall have the option to purchase shall represent four percent (4%) of the total number of the shares of Purchaser issued and outstanding as of the Closing Date.

2.    Shareholder may exercise the options granted hereunder upon the adoption of a plan of merger or share exchange by Purchaser's Board of Directors or the sale of all or substantially all of the assets of Purchaser by delivery of notice to Purchaser specifying the number of shares of the stock of Purchaser Shareholder has elected to purchase.

3

3.    Upon receipt of Shareholder's notice of exercise, Purchaser shall issue to Shareholder a stock certificate evidencing the number of shares so purchased by Shareholder.

B.    Purchaser agrees to purchase from Shareholder, on or before July 1, 2009, all shares of the stock of Purchaser then held by Shareholder (the "Option Stock") and all options granted hereunder that have not been exercised by Shareholder (the "Unexercised Options") for an amount equal to the Appraised Value of Purchaser (as hereinafter defined) multiplied by a fraction, the numerator of which is the total number of shares of the Option Stock plus the number of shares of the stock of Purchaser Shareholder could purchase upon the exercise of the Unexercised Options and the denominator of which is equal to the total number of shares of the stock of Purchaser issued and outstanding plus the number of shares of the stock of Purchaser Shareholder could purchase upon the exercise of the Unexercised Options. The Appraised Value of Purchaser shall be equal to the value of Purchaser as determined by an appraiser mutually acceptable to Purchaser and Shareholder. If Purchaser and Shareholder are unable to agree on an appraiser, the Appraised Value of Purchaser shall be equal to the average of the appraised values of Purchaser established by an appraiser selected by Purchaser, an appraiser selected by Shareholder and an appraiser selected by the appraisers selected by Purchaser and Shareholder. Purchaser shall be valued as a going concern. The purchase price for the Option Stock and the Unexercised Options shall be paid in cash or other immediately available funds upon Purchaser's purchase of the Option Stock and Unexercised Options. Shareholder

4

and Purchaser shall each be solely responsible for the costs of the appraiser they selected (if any) and shall each be responsible for fifty percent (50%) of the cost of the mutually acceptable appraiser or the third appraiser (if any).

C.  In addition to any other rights Shareholder may have, in the event of the sale of all or substantially all of the assets of Purchaser, the sale or transfer of a controlling interest in Purchaser or a merger or share exchange involving Purchaser before July 1, 2009, Shareholder may, at its option, require Purchaser to purchase the Option Stock and all Unexercised Options at the price and on the terms described above at any time upon notice to Purchaser.

D.  Purchaser shall not issue or redeem any shares of its stock without the prior written consent of Shareholder, which shall not be unreasonably withheld. Subject to the above described limitation, any stock issued by Purchaser after the date hereof shall be issued only to enhance shareholder value.

E.  Purchaser represents that neither it nor its shareholders have elected to have Purchaser treated as a small business corporation pursuant to Subchapter S of the Internal Revenue Code.

IV.  **PROFITS**

A.  As additional consideration for the Stock, Purchaser shall pay to Shareholder an amount equal to the profits of the Company for the calendar year 2002 as follows:

1.  FIFTY PERCENT (50%) of said profits on or before JANUARY 31, 2003;

2.  TWENTY PERCENT (20%) of said profits on or before MARCH 31, 2003;

5

3.    TWENTY PERCENT (20%) of said profits on or before APRIL 30, 2003; and

4.    TEN PERCENT (10%) of said profits on or before MAY 1, 2003.

B.    The amount of the Company's profits to be paid to Shareholder hereunder shall be reduced by an amount equal to Purchaser's actual acquisition related costs, which reduction shall in no event exceed ONE HUNDRED FIFTY THOUSAND AND NO/00 DOLLARS ($150,000.00).  Purchaser shall provide Shareholder with documentation regarding such costs upon request.

C.    The profits of the Company for 2002 shall be as mutually determined by Purchaser and Shareholder utilizing the accounting principles used by the Company in determining its profits for prior years consistent with past practice. Any expenses, capital expenditures or other liabilities associated with the transactions contemplated hereby or the transition of the business to Purchaser shall not reduce the Company's profits for calendar year 2002, including, without limitation, all actual acquisition related costs described in Section IV.B above, any capital expenditures incurred after the date hereof, any overhead or similar items not consistent with past practice or any extraordinary items associated with the operations of the Company after the date hereof, it being understood that the amount described in Section IV.B above is intended to account for any costs associated with the transfer of the business of the Company and for systems, warehousing and personnel upgrades.  In the event the profits of the Company have not been finalized as of the date of any payment due hereunder, said payment shall be calculated using an estimate of the profits mutually acceptable to

6

Purchaser and Shareholder (if Purchaser and Shareholder are unable to agree, the estimate shall be equal to one hundred fifteen percent (115%) of the annualized profit of the Company utilizing the profit of the Company as of June 30, 2002) and payments due thereafter shall be adjusted to account for any difference between the estimated and actual profits.

D.     In the event the federal taxes paid by Shareholder with respect to payments hereunder exceed twenty percent (20%) of the profits paid to Shareholder hereunder, an amount equal to such excess shall be immediately paid to Shareholder by Purchaser. Shareholder shall be responsible for all state taxes on said profit.

V.     **CORPORATE ASSETS AND LIABILITIES**

A.     On the Closing Date, Purchaser and Shareholder shall determine the Company's assets and liabilities as of the Closing Date. Should the book value of the Company's assets exceed the amount of the Company's balance sheet liabilities, the amount of the excess shall be added to the Purchase Price and the amount to be paid per Section II.A.4. hereof shall be increased by said excess amount. Should the amount of the Company's balance sheet liabilities exceed the book value of the Company's assets, the amount of the excess shall be deducted from the payment due at Closing per Section II.A.4. herein and, if necessary, from the payments in Section II.A.2. and 3. herein.

B.     Notwithstanding anything to the contrary contained herein, Shareholder may, at any time after the date hereof, cause the Company to redeem a portion of the Stock, or pay a distribution to Shareholder, for or in an amount not to exceed $500,000.00.

7

C.   In the event the federal taxes paid by Shareholder with respect to payments hereunder or the redemption or distribution described in Section V.B. exceed twenty percent (20%) of the amounts paid to Shareholder hereunder, an amount equal to such excess shall be immediately paid to Shareholder by Purchaser. Shareholder shall be responsible for all state taxes on said amounts.

VI.   **CONDITIONS OF CLOSING**

A.   The obligation of Purchaser to consummate the transactions contemplated hereby is expressly subject to the satisfaction, prior to Closing, of the following described conditions:

1.   Purchaser shall perform an audit of the Company's assets and liabilities as of August 28, 2002.

2.   That no lawsuits or corporate liabilities exist as of June 30, 2002, other than those liabilities that have been disclosed to Purchaser and obligations or liabilities of the Company incurred in the ordinary course of business.

3.   No action or proceeding shall have been commenced against the Company relating to this Agreement or the transactions contemplated hereby.

4.   Delivery to Purchaser of a Covenant Not to Compete in the form attached as Exhibit D hereto duly executed by Robert W. Heinzel.

B.   The obligation of Shareholder to consummate the transactions contemplated hereby is expressly subject to the satisfaction, prior to Closing, of the following described conditions:

1.   Shareholder's receipt of the payments described in Section II.A.1. and 2.

2.   Shareholder's receipt of the Note duly executed by Purchaser.

8

3.    Shareholder's receipt of an Employment Agreement in the form attached as <u>Exhibit E</u> hereto duly executed by the Company.

4.    Shareholder's receipt of CIT's agreement to the provisions of Section II.C. hereof.

5.    Shareholder's receipt of personal financial information regarding Christopher Anthony and Shareholder's determination that Mr. Anthony has sufficient net worth to guaranty the obligations of Purchaser hereunder.

6.    Shareholder's receipt of the documentation described in Section II.B. and C. hereof.

7.    Shareholder and Purchaser shall have agreed on the adjustment of the Purchase Price pursuant to Section V.

C.    The failure of any condition to be satisfied at or prior to Closing shall render this Agreement null and void, and all monies or documents theretofore delivered shall be returned to their original owner, and all parties shall be thereupon relieved of all liabilities hereunder provided, however, that in the event Purchaser breaches any of the provisions of this Agreement, or any of the conditions contained in Section VI.B.1., 2., 3., 6. or 7. have not been satisfied or waived, Shareholder shall be entitled to retain the payment made pursuant to Section II.A.1. hereof.

## VII.   CLOSING DATE

The closing of this transaction (the "Closing") shall take place at the offices of Purchaser's attorneys on the later of August 29, 2002, or two (2) days after receipt of CIT's agreement to the provisions of Section II.C. hereof or Shareholder's waiver of receipt of CIT's agreement, or such other date, time or place as Purchaser and

9

Shareholder shall agree in writing. Such date is herein called the "Closing Date" or the "Effective Date". At Closing, Shareholder will deliver to Purchaser the Stock Certificate representing in the aggregate all of the Stock, duly endorsed or with stock powers attached thereto along with all other documents required hereby. Purchaser will deliver to Shareholder the Purchase Price as set forth in Section II herein along with all other documents required hereby. Shareholder shall tender the Stock with a stock power endorsed in blank to Purchaser.

VIII.   **REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER**

Shareholder represents and warrants to Purchaser that:

A.      The Company is a corporation duly organized and validly existing under the laws of the State of Wisconsin, has, within its most recently completed report year, filed the annual report required under Section 180.1622 of the Wisconsin Business Corporation Law and has full corporate power and authority to carry on and conduct the businesses in which it is now engaged and to own and operate its properties and assets.

B.      The authorized capitalization of the Company consists of Nine Thousand (9,000) shares at a par value of $.10 per share.

C.      Shareholder has full power and authority to enter into this Agreement and is not a party to any Shareholder's Agreement barring them from selling the Stock to Purchaser as anticipated in this Agreement.

D.      This Agreement has been duly executed and delivered by or on behalf of the Shareholder. This Agreement is a valid and legally binding Agreement of the Shareholder, enforceable in accordance with its terms, subject to bankruptcy,

10

insolvency, reorganization and similar laws now or hereafter in effect, relating to creditor's rights and except that the remedy of specific performance and injunctive relief and other forms of equitable defenses and to the discretion of the court before which any proceeding therefore may be brought.

E.   The execution and delivery by Shareholder of this Agreement does not, and the compliance by Shareholder with the terms thereof, will not result in any violation of or be in conflict with or constitute a default under any term or provision of the Articles of Incorporation or bylaws of the Company or so far as is known to Shareholder of any law, statute or governmental regulation or of any license, judgment, decree, order, agreement, indenture or other instrument applicable to the Company of which Shareholder has knowledge.

F.   So far as is known to Shareholder, there is no legal action, suit, proceeding or claim and no investigation by any governmental agency pending or threatened against the Company or the assets, business or goodwill of the Company which would have a materially adverse effect on the financial or other condition, assets, business, goodwill or prospects of the Company or upon the transactions contemplated by this Agreement.

G.   To the best of Shareholder's knowledge, under existing provisions of law, no consent, approval, order or authorization of, and no registration, declaration, filing or recording with any governmental authority is required to be obtained by the Company in connection with the transactions contemplated by this Agreement.

H.   Subsequent to December 31, 2001, the Company has not declared or paid any dividends or any distribution with respect to shares of its capital stock or made

11

any direct or indirect redemption, purchase or other acquisition of shares of its capital stock.

I.    Shareholder is the owner of the Stock and they have the full right and authority to sell and transfer all of the Stock, as herein provided, free and clear of any lien, encumbrance, equity or claim of any kind.

J.    The authorized, issued and outstanding capital stock of the Company is as follows:

| Class | Shares Authorized | Shares Issued and Outstanding |
|---|---|---|
| Common | 9,000 | 1,000 |

All of the issued and outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid and non-assessable except as provided in Section 180.0622 of the Wisconsin Business Corporation Law as judicially interpreted. None of such shares was issued in violation of the preemptive rights of a shareholder of the Company. There are no outstanding subscriptions, warrants, options or rights requiring the issuance of any additional shares of capital stock of the Company. All of the outstanding issued shares have been issued in full compliance with all applicable laws of the State of Wisconsin and the Securities and Exchange Commission, as applicable.

K.    The Company has filed all federal, state, county and local tax returns and reports and such other tax returns and reports as are required to be filed, except those local tax returns and other reports as to which failure to file does not individually or in the aggregate have a material adverse effect on the financial or other condition, business, prospects, assets or goodwill of the Company.

12

L.   Since May 31, 2002, the Company has not:

1.   Issued, sold, purchased or redeemed or agreed to issue, sell, purchase or redeem any of the common stock reserved for issuance as reflected in the Company's balance sheet, subdivided or in any way reclassified any of its capital shares, declared or made any payment, dividend or other distribution to its stockholders as such, granted any option or made any commitment relating to its authorized capital shares;

2.   Incurred any liability under agreements or otherwise, except

   a.   liabilities incurred and obligations entered into in the ordinary course of business, which individually or in the aggregate do not have a materially adverse effect on the financial or other condition, business, prospects, assets or goodwill of the Company; and

   b.   obligations or liabilities entered into or incurred in connection with the execution and performance of this Agreement;

3.   Except in the ordinary course of business (i) sold or transferred or entered into any agreement relating to the sale or transfer of any tangible or intangible asset; or (ii) entered into any lease of real property, machinery, equipment or buildings;

4.   Suffered any material loss or damage to any of its properties (whether or not covered by insurance); or

5.   Entered into or agreed to enter into any transaction other than in the ordinary course of business, except in connection with the execution and

13

performance of this Agreement and except transactions disclosed in or permitted by this Agreement.

IX.    **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Shareholder that:

A.    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois.

B.    Purchaser has full corporate power and authority to enter into this Agreement and the execution and delivery by Purchaser of this Agreement and the compliance by Purchaser with the terms hereof will not result in any violation of or be in conflict with or constitute a default under any term or provision of Purchaser's Articles of Incorporation or bylaws or so far as is known to Purchaser of any law, statute or governmental regulation or of any license, judgment, decree, order, agreement, indenture or other instrument applicable to Purchaser of which Purchaser has knowledge.

C.    This Agreement has been duly executed and delivered by or on behalf of Purchaser and this Agreement, the Note, the Collateral Pledge Agreement and all other agreements and documents signed by Purchaser in connection herewith have been duly authorized, and are the valid and legally binding agreements of Purchaser enforceable in accordance with their respective terms.

D.    Under existing provisions of law, no consent, approval, order or authorization of and no registration, declaration, filing or recording with any governmental authority is required to be obtained by Purchaser in connection with the transactions contemplated by this Agreement.

14

E.   So far as is known to Purchaser, there is no action, suit, proceeding or claim and no investigation by any governmental agency pending or threatened against Purchaser or Shareholder which would have materially adverse effect on the transactions contemplated by this Agreement.

F.   Purchaser is acquiring the Stock solely for its own account for investment, and not on behalf of other persons or with the view to the distribution or resale thereof. Purchaser further represents that its financial condition is such that it is not under any present necessity or constraint to dispose of any of the Stock to satisfy any existing or contemplated debt or undertaking. Purchaser has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for or which is likely to compel a disposition in any manner of any of the Stock, it is not aware of any circumstances presently in existence which are likely to promote in the future any disposition of any of the Stock and it does not have any plan or intent to sell any of the Stock upon the occurrence or nonoccurrence of any predetermined or undetermined event or circumstances.

G.   Purchaser is aware that none of the shares of the Stock have been registered (nor is registration contemplated) under the Securities Act of 1933, as amended (the "Act") and, accordingly, that federal and state securities laws require that the Stock must be held indefinitely unless subsequently registered under the Act or unless a sale or transfer may be made without registration thereunder. Purchaser represents that it fully understands that neither the Company nor Shareholder is under any obligation, and neither has given any commitment whatsoever, to

15

register any of the Stock under the Act, or to publicly disseminate information concerning the Corporation pursuant to the Securities Exchange Act of 1934 or any applicable state securities laws. Accordingly, Purchaser understands that it must bear the economic risk of the investment in the Stock for an indefinite period.

H.    Purchaser acknowledges and admits that no federal or state agency has recommended or endorsed the purchase of the Stock.

I.    Purchaser acknowledges and admits that neither the Company nor any person acting on behalf of the Company (including Shareholder) offered the stock by means of any form of general advertising, such as media advertising or seminars.

J.    All of the negotiations concerning this transaction have been carried on solely by the parties and their respective employees, counsel and financial advisors. Purchaser has not dealt with any unaffiliated broker, or other person, who could claim a broker's fee or other remuneration with regard to any purchase of the Stock nor is Purchaser aware of any commission or other remuneration being paid or given or to be paid or given directly or indirectly with regard to such purchase. Purchaser has relied upon its own legal counsel as to all legal matters and questions presented with reference to the offering and has relied upon the financial expertise of its accountants and other financial advisors as to all financial matters and questions presented with reference to this offering.

K.    The representations set forth herein shall become effective and binding upon Purchaser, and upon Purchaser's legal representatives, successors and assigns.

16

L.  Purchaser fully comprehends the terms, conditions and consequences relating to its purchase of the Stock, including the possibility that it must hold the Stock indefinitely.

M.  Purchaser agrees that the representations and warranties contained herein shall be for the benefit of Shareholder and the Company and its respective affiliates and control persons.

X.  **COVENANTS AND AGREEMENTS**

Shareholder agrees that from and after the date of this Agreement and until the Closing Date, except as permitted by this Agreement or otherwise consented to or approved by Purchaser:

A.  The business of the Company shall be conducted in the ordinary course and consistent with past practices and the Company shall take such action as may be reasonably necessary to preserve its material properties and assets, wherever located, and to comply with all applicable laws, ordinances, regulations and orders of all governmental agencies and other regulatory authorities, and the Company shall confer with representatives of Purchaser to keep it reasonably informed with respect to operational matters of a material nature.

B.  The Company shall not:

  1.  amend its Articles of Incorporation or Bylaws;

  2.  change the number of authorized shares of its capital stock as set forth in the recitals hereto; or

  3.  declare, set aside or pay any dividend or other distribution or payment in cash, stock or property in respect of shares of capital stock of the Company.

17

C.    The Company shall not:

    1.    issue, grant, sell or pledge, or agree or propose to issue, grant, sell or pledge any shares of, or rights of any kind to acquire any shares of, the capital stock of the Company;

    2.    except for purchases of equipment, inventory or other assets acquired in the ordinary course of business and temporary investments of excess cash in the ordinary course of business and consistent with past practices, purchase or acquire all or any part of the assets, properties, capital stock of business of, or make any investment in, any other person, or merge or consolidate with any other person;

    3.    except for the sale of inventory in the ordinary course of business, dispose of, encumber or mortgage any assets or properties which, individually or in the aggregate, are material to the Company;

    4.    incur any debt, liability or obligation, direct or indirect, whether accrued, absolute, contingent or otherwise, other than in the ordinary course of business and consistent with past practices;

    5.    except in the ordinary course of business, make any loan or advance to any individual, firm or corporation;

    6.    except in the ordinary course of business, assume, guarantee or in effect guarantee (through an agreement to take or pay or otherwise) the obligations of any person; or

    7.    except in the ordinary course of business, waive, release, grant or transfer any rights of material value, cancel, compromise, release or assign any

18

indebtedness owed to it or any claims held by it or modify or change in any material respect any material existing license, lease, contract or other document;

D. The Company shall preserve intact its business organization and use its reasonable efforts to keep available the services of its present officers and key employees and to preserve the goodwill of those having business relationships with it; and

E. The Company shall not cause or permit any of its current insurance contracts to be canceled or terminated or any of the coverage thereunder to lapse, unless simultaneously with such cancellation, termination nor lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed polices for substantially similar premiums are in full force and effect.

Purchaser's sole remedy for a breach of this Section shall be to terminate this Agreement and recover its actual costs of preparing for the transition of the business of the Company which shall be limited to Purchaser's actual out-of-pocket costs for systems, warehousing and personnel upgrades (which shall not exceed $150,000.00) less the fair market value of such items and Purchaser acknowledges and agrees that Shareholder shall not be liable to Purchaser for any other damages resulting from a breach of any of the covenants contained herein.

XI.    INDEMNIFICATION

A. The representations, warranties, covenants and agreements given by Shareholder which are contained in this Agreement shall survive the Closing Date for a period of eighteen (18) months.

19

B.    Shareholder agrees to indemnify Purchaser against any loss, cost, liability, or expense (including, without limitation, costs and expenses of litigation and reasonable attorneys' fees) incurred by reason of the incorrectness or breach of any of said representations and warranties, covenants, and agreements (other than those contained in Section X hereof) contained in this Agreement.

C.    The liability of Shareholder for the indemnification obligations arising hereunder shall be limited to claims for which Purchaser delivers written notice to Shareholder within eighteen (18) months after the Closing Date. Said notice shall contain a description of the claim in reasonable detail as well as the basis for Purchaser's claim for indemnification hereunder and Purchaser's estimate of the damages.

D.    Shareholder's obligations pursuant to the provisions of this Paragraph XI are subject to the following limitations:

1.    Purchaser shall not be entitled to any recovery for any claims until the total amount of such claims exceeds Twenty Five Thousand Dollars ($25,000.00). Thereafter, Purchaser shall be entitled to recovery only for such claims in excess of Twenty Five Thousand Dollars ($25,000.00).

2.    Purchaser shall not be entitled to any recovery for any claims in excess of the Purchase Price actually paid to Shareholder hereunder. Shareholder acknowledges that this Section XI.D.2. shall not limit Purchaser's remedies described in Section X above.

3.    Purchaser hereby waives any right it may have to claim or recover any special, exemplary, punitive or consequential damages, or any damages

other than, or in addition to, actual damages, arising out of a breach of this Agreement.

4.    Purchaser's recovery hereunder shall be reduced by any amounts received by Purchaser or the Company pursuant to any insurance policy maintained by or for the benefit of Purchaser or the Company in connection with the facts or circumstances that are the basis for indemnity hereunder.

E.    Purchaser's rights pursuant to this Paragraph XI shall be Purchaser's sole remedy for any breach of the terms of this Agreement.

## XII.    TERMINATION

A.    Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated prior to the Closing Date:

1.    By mutual written consent of Shareholder and Purchaser;

2.    By Purchaser (by written notice to Shareholder) if any condition in Section VI.A. hereof has not been met or waived in writing at or prior to the Closing Date;

3.    By Shareholder (by written notice to Purchaser) if any condition in Section VI.B. hereof has not been met or waived in writing at or prior to the Closing Date; or

4.    By either Purchaser or Shareholder (by written notice to the other) if the Closing shall not have occurred on or before October 1, 2002, or such other later date as the parties may agree to in writing.

B.    In the event of the termination and abandonment of this Agreement pursuant to a provision of Section XII.A. above, this Agreement shall become void and have no effect, without liability on the part of any of the parties or their directors, officers

21

or stockholders in respect of this Agreement, except with respect to treatment of confidential information.

XIII.    **EXPENSES**

The parties will each pay their own expenses and fees incident to the negotiation, preparation and execution of this Agreement and any other transactions relating to the consummation thereof including without limitation fees of counsel, accountants and other experts and printing costs. Purchaser acknowledges and agrees that Shareholder's fees may be paid by the Company.

XIV.    **SURVIVAL**

Except as otherwise provided herein, the respective representations, warranties, covenants and agreements of Shareholder and Purchaser contained in this Agreement shall survive and not be extinguished by the consummation of this transaction on the Effective Date.

XV.    **COVENANTS AND AGREEMENTS**

A.    At all times subsequent to Closing, Shareholder and Purchaser each will permit the other party and their representatives including, but not limited to, lawyers and accountants, during normal business hours, to have reasonable access to and examine and make copies of all books, records, files, and documents in its possession which relate to the Company or which relate to transactions or events occurring prior to the Closing or to transactions or events occurring subsequent to the Closing or to transactions or events occurring subsequent to the Closing which are related to or arise out of transactions or events relating to the Closing. Shareholder shall deliver prior to or at the Closing, all items, books, records, files, agreements, purchase orders, internal reports and materials in Shareholder's

22

possession relating to the Company but excluding therefrom any partnership books, tax returns and similar items of Shareholder. Until five years subsequent to when all amounts are paid under the Note, neither Shareholder nor Purchaser will destroy or otherwise dispose of any of the books, records, files or documents relating to the Company, provided that any party may discard any of the above sixty days after giving the other party notice of such intention containing a detailed description of the items to be discarded and provided that the other party has not given notice in writing of its intention to take possession thereof.

B.    Shareholder shall be responsible for and pay sales, use and transfer taxes, if any, payable to the State of Wisconsin or any other governmental entity located within the State of Wisconsin in connection with transfer of the Stock to Purchaser.

C.    Shareholder shall provide to Purchaser at Closing, appropriate lien searches showing that the Stock is free and clear of any liens or encumbrances.

D.    At Closing, Purchaser shall cause the Company to execute a General Release whereby the Company releases Shareholder from and waives any and all claims, if any, the Company may have against Robert W. Heinzel and/or Elizabeth A. Heinzel whether in their capacity as a shareholder, director, officer, employee or agent of the Company in a form acceptable to Shareholder.

## XVI. GOVERNING LAW

This Agreement shall be construed under and governed by the laws of the State of Wisconsin. It is specifically agreed by and between the parties hereto that if any of the provisions of this Agreement shall contravene or be invalid under the laws of the State of Wisconsin, then it is agreed that such contravention or invalidity shall not invalidate the

23

whole Agreement, but it shall be construed as if not containing the particular provision or provisions held to be invalid.

XVII. **MISCELLANEOUS**

    A.    This Agreement supersedes and replaces all prior negotiations and any other agreement or agreements, oral or written, concerning the subject matter of this Agreement.

    B.    The articles headings have been inserted for convenience or reference only, and are not to be construed as a part of this Agreement.

    C.    This Agreement may be executed in any number of counterparts. Each counterpart shall be considered an original and no other counterpart need be produced for any purpose.

    D.    All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been given if delivered or mailed or faxed as follows:

        1.    Purchaser:    ILLINOIS INDUSTRIAL TOOL, INC
                        c/o JOHN M. MORRONE
                        Attorney at Law
                        12820 S. Ridgeland Av., Unit C
                        Palos Heights, Illinois 60463
                        Facsimile Number: (708) 653-3154

        2.    Shareholder:    ROBERT HEINZEL
                        11917 Indian Trail
                        Hales Corners, WI 53130

                With a copy to:    Steven R. Glaser, Esq.
                        Davis & Kuelthau s.c.
                        111 E. Kilbourn Ave., Suite 1400
                        Milwaukee, WI 53202
                        Facsimile Number: 414-278-3698

or such other address as Purchaser or Shareholder may designate by notice to the other party.

If telefax transmissions are used, it will be accepted notice only if a hard copy of the transmission plus a copy of the proof of transmission is mailed to the party receiving the telefax no later than the third (3rd) business day following the telefax transmission.

E.    The Agreement is for the benefit of, and may be enforced only by, the parties who are signatories hereto and their permitted successors and assigns. The agreement is not for the benefit or, and may not be enforced by, any third party.

F.    Purchaser and Shareholder will, except to the extent required by law in the written opinion of independent legal counsel (which opinion shall promptly be provided to the other party), refrain from issuing any press release, publicity statement or other public notice relating to this Agreement or the transactions contemplated hereby.

## XVIII. BURDEN AND BENEFIT

This Agreement, in all respects, shall be binding on, and shall inure to the benefit of, the parties hereto and their respective successors, heirs and assigns. Neither this Agreement nor any rights hereunder may be assigned or transferred, and no duties may be delegated, by either party without the written consent of the other and any purported assignment without written consent shall be null and void and of no force or effect.

25

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

PURCHASER:

ILLINOIS INDUSTRIAL TOOL, INC.

By _____
    Chairman and Chief Executive Officer

SHAREHOLDER:

_____
Robert W. Heinzel

_____
Elizabeth A. Heinzel

26

# EXHIBIT B

# PROMISSORY NOTE

$2,266,702.00

Milwaukee, Wisconsin
September 24, 2002

FOR VALUE RECEIVED, ILLINOIS INDUSTRIAL TOOL, INC., an Illinois corporation ("Maker") promises to pay to the order of ROBERT W. HEINZEL and ELIZABETH A. HEINZEL, husband and wife, or their successors or assigns ("Payee"), the principal sum of Two Million Sixty Six Thousand Seven Hundred Two and no Dollars ($2,266,702.00) together with interest on the unpaid principal balance hereof from the date of this Note at the rate of six percent (6%) per annum, in lawful money of the United States of America, on the terms hereinafter set forth.

The principal and interest owing under this Note shall be due and payable in three (3) equal annual payments of principal and interest on December 31, 2003, December 31, 2004, and December 31, 2005. Payments hereunder shall be credited first to accrued interest and then to unpaid principal.

The obligations of the Maker under this Note are secured by a security interest on all of the assets of Maker pursuant to a General Business Security Agreement by and between Maker and Payee, a security interest on all of the assets of JMK Sales, Inc. pursuant to a General Business Security Agreement by and between JMK Sales, Inc. and Payee, and by the pledge of all of the stock of the JMK Sales, Inc. pursuant to a Collateral Pledge Agreement by and between Maker and Payee, and are guaranteed by Christopher Anthony pursuant to a Personal Guaranty, and by JMK Sales, Inc pursuant to a Guaranty, all of even date herewith.

All payments due hereunder shall be made at Payee's address set forth below unless Payee provides Maker with written notice of a different address for delivery of payment, at least ten (10) days in advance of any payment date.

This Note may be prepaid at any time and from time to time, in whole or in part, without premium or penalty.

Upon default in the payment of any amounts due or in any of the warranties, representations, covenants or other obligations of Maker hereunder or under any of the agreements described above, the holders hereof may, at their option, accelerate all sums due hereunder upon notice to Maker. All amounts not paid when due hereunder shall bear interest, compounded monthly, at the rate of twelve percent (12%) per annum. Maker shall indemnify Payee upon demand for all costs (including reasonable attorneys' fees and expenses) incurred by Payee in connection with the enforcement of their rights hereunder and under the agreements described above, plus interest thereon at the rate described in the preceding sentence of this paragraph.

In the event Maker (i) is dissolved; (ii) authorizes or makes an assignment for the benefit of creditors; (iii) generally does not pay its debts as they become due; (iv) admits in writing its inability to pay its debts generally; or (v) authorizes or commences (whether by the entry of an

order for relief or the appointment of a receiver, trustee, examiner, custodian or other similar official therefor or for any substantial part of its property) any proceeding or voluntary case under any bankruptcy, reorganization, insolvency, dissolution, liquidation, adjustment or arrangement of debt, receivership or similar laws or if such proceedings are commenced or instituted, or an order for relief or approving any petition commencing such proceedings is entered against Maker, and such proceedings are not dismissed within thirty (30) days after the date of filing, commencement or institution, then the unpaid balance of this Note shall become immediately due and payable without any notice, demand or other action of any kind.

All notices, demands and requests required or desired to be given hereunder shall be in writing and shall be delivered in person or by United States registered or certified mail, return receipt requested, postage prepaid and addressed, in the case of Maker, to:

Illinois Industrial Tool, Inc.
5111 West 122nd Street
Alsip, IL 60803
Attn: Christopher Anthony

and in the case of Payee to:

Robert and Elizabeth Heinzel
11917 Indian Trail
Hales Corners, WI 53130

with a copy to:

Steven R. Glaser, Esq.
Davis & Kuelthau, S.C.
111 E. Kilbourn Ave., Ste. 1400
Milwaukee, WI 53202-6613

or at any such changed addresses or to the attention of such other party as may from time to time be designated in writing by the party to be given notice. Mailed notices shall be deemed given on the date of their deposit in the United States mail.

Maker waives its rights to assert or impose any defense (other than payment), set-off, counterclaim or cross-claim in any action brought on this Note. Maker waives presentment, demand for performance, notice of performance, protest, notice of protest, notice of dishonor and all other notices and proceedings required as a condition for payment or collection hereof.

No delay on the part of Payee or any holder hereof in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege hereunder shall preclude other or further exercise thereof or the exercise of any other right, power or privilege. The failure of Payee or any holder hereof to enforce any provision of this Note or any document, instrument or agreement made or entered into in connection herewith or the failure of Payee or the holder hereof to enforce any of their rights at

INSTALLMENT NOTE – Page 2 of 3

Initialed for
Identification:

_____

any time arising from any source, or for any reasons, is not, and shall not be deemed to be, a waiver of any of the rights of Payee or the holder hereof.  Those rights may, but need not be enforced by Payee or nay holder hereof at any other time.

Payee may assign this Note or any right or obligation hereunder without Maker's prior written consent.  Maker may not assign this Note or its obligations hereunder without Payee's prior written consent and any purposed assignment without such consent shall be null and void and of no force or effect.

This Note and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the internal laws of the State of Wisconsin, without regard to principles of conflict of law.  Maker agrees that all actions or proceedings in any manner relating to or arising out of this Note or the other agreements described herein may be brought only in courts of the state of Wisconsin located in Milwaukee County, Wisconsin, or the federal court for the Eastern District of Wisconsin and Payee consents to the jurisdiction of such courts.  Payee waives any objection it may now or hereafter have to claim that any such action or proceeding is in an inconvenient court.

IN WITNESS WHEREOF, Maker has executed or caused this Note to be executed as of the date first written above.

ILLINOIS INDUSTRIAL TOOL, INC.
an Illinois corporation

By: _____

Christopher Anthony, Chief Executive Officer

INSTALLMENT NOTE – Page 3 of 3

Initialed for
Identification:

_____

# EXHIBIT 1
## (PART 2)

# EXHIBIT C

Case 1:08-cv-01544   Document 1-2   Filed 03/14/2008   Page 33 of 62

## SUBORDINATION AGREEMENT

This SUBORDINATION AGREEMENT is entered into as of February 28, 2003 (the *"Subordination Agreement"*), by and among ROBERT HEINZEL, an individual, and [E]LIZABETH HEINZEL, an individual (the *"Junior Creditors"*), who both reside at 11917 [In]dian Trail, Hales Corners, Wisconsin, 53130, LASALLE BANK NATIONAL [AS]SOCIATION, a national banking association (the *"Bank"*), whose address is 135 South [La]Salle Street, Chicago, Illinois 60603, and ILLINOIS INDUSTRIAL TOOL, INC., (f/k/a [M]idwest Tool Distributors, Inc. and d/b/a JMK/IIT Inc.) an Illinois corporation whose address is [1]1 W. 122nd St., Alsip, Illinois  60803 (*"IIT"*) and JMK SALES, INC., a Wisconsin [co]rporation whose address is 5140 International Drive, Cudahy, Wisconsin, 53110 (*"JMK"*).

### R E C I T A L S :

A.     IIT is indebted to the Junior Creditors in the principal amount of TWO MILLION [T]WO HUNDRED SIXTY-SIX THOUSAND SEVEN HUNDRED TWO DOLLARS [($2],266,702.00), as evidenced by that certain Promissory Note attached hereto as Exhibit A (the *["J]unior Note"*).

B.     The Junior Creditors desire that the Bank extend credit to IIT and JMK (together *"Borrowers"* and each individually, a *"Borrower"*) from time to time as the Bank in its sole [dis]cretion may determine, and the Bank has refused to consider the extension of such credit until [the] "Junior Debt" (as defined below) is subordinated to the "Senior Debt" (as defined below) in [the] manner hereinafter set forth; and

C.     The extension of credit, as aforesaid, by the Bank is necessary or desirable to the [con]duct and operation of the business of the Borrowers, and will inure to the benefit of the Junior [Cre]ditors.

NOW, THEREFORE, in consideration of the extension of credit by the Bank to the [Bor]rowers, as the Bank may, in its sole discretion, determine, and for other good and valuable [con]sideration to the Junior Creditors, the receipt and sufficiency of which are hereby [ack]nowledged, the Junior Creditors and the Borrowers hereby agree with the Bank as follows:

### A G R E E M E N T S :

1.    <u>Subordination.</u>

1.1     The Junior Creditors hereby subordinate the indebtedness evidenced by [the J]unior Note, and any and all other indebtedness now or at any time or times hereafter owing [by t]he Borrowers, or any successor or assign of the Borrowers, including without limitation, a [rece]iver, trustee or debtor-in-possession (the term *"Borrower"* or *"Borrowers"* as used [here]inafter shall include any such successors or assigns) to the Junior Creditors, whether such [inde]btedness is absolute or contingent, direct or indirect and howsoever evidenced, including [with]out limitation, all interest thereon, including pre-petition and post-petition interest, fees and [expe]nses and any other charges, and any refinancings thereof (collectively, the *"Junior Debt"*)

any and all indebtedness now or at any time hereafter owing by the Borrowers to the Bank, whether absolute or contingent, direct or indirect and howsoever evidenced, including, but not limited to, all pre-petition and post-petition interest thereon, fees, expenses and all other demands, claims, liabilities or causes of action for which the Borrowers may now or at any time times hereafter be in any way liable to the Bank, whether under any agreement, instrument or document executed and delivered or made by the Borrower to the Bank or otherwise, including any refinancings thereof (collectively, the *"Senior Debt"*).

    1.2    The Junior Creditors hereby subordinate all security interests, liens, encumbrances and claims, whether now existing or hereafter arising, which in any way secure the payment of the Junior Debt (the *"Junior Creditors' Collateral"*) to all security interests, liens, encumbrances and claims, whether now existing or hereafter arising, which in any way secure the payment of the Senior Debt (the *"Bank's Collateral"*).

    1.3    The Junior Creditors shall not take any action to enforce any of its liens on the Junior Creditors' Collateral, and shall not ask for or receive from the Borrowers or any other person or entity any security for the Junior Debt not specifically granted by the Junior Note.

    1.4    The Junior Creditors agree that it shall have no right to possession of any assets included in the Junior Creditors' Collateral or in the Bank's Collateral, whether by judicial action or otherwise.

    1.5    The Junior Creditors agree to instruct the Borrowers not to pay, and agree not to accept payment of, or assert, demand, sue for or seek to enforce against the Borrowers or any other person or entity, by setoff or otherwise, all or any portion of the Junior Debt, with the exception that IIT may make scheduled payments of principal under the terms and conditions of the Junior Note and accrued interest on the Junior Note at a per annum rate of interest not in excess of the rate in effect from time to time under the Junior Note (which rate may not be increased without the prior written consent of the Bank) provided, however, that the Borrowers shall not pay, and the Junior Creditors shall not accept, any payments of the Junior Debt following the occurrence of a default under any of the loan documents evidencing the Senior Debt.

    1.6    The Junior Creditors hereby assign to the Bank and subrogate to the Bank all of the Junior Creditors' right, title and interest in and to the Junior Debt and the Junior Creditors' Collateral, and hereby irrevocably authorizes the Bank (i) to collect, receive, enforce and accept any and all sums or distributions of any kind, whether cash, securities or other property, that may become due, payable or distributable on or in respect of the Junior Debt or the Junior Creditors' Collateral, whether paid directly by the Borrowers or paid or distributed in any liquidation, bankruptcy, arrangement, receivership, assignment, reorganization or dissolution proceedings or otherwise, and (ii) in the Bank's sole discretion, to make, present and vote claims therefor in, and take such other actions as the Bank deems necessary or advisable in connection with, any such proceedings, either in the Bank's name or in the name of the Junior Creditors, including, but not limited to, any election in any proceeding instituted under Chapter 11 of Title 11 of United States Code (11 U.S.C. § 101 et. seq.) (the *"Bankruptcy Code"*); and agrees that upon the written request of the Bank it will promptly assign, endorse and deliver to and deposit

8

2

h the Bank without recourse, representation, or warranty, all agreements, instruments and :uments evidencing the Junior Debt, including without limitation the Junior Note.

1.7    Each Junior Creditor hereby agrees that all agreements, instruments and :uments evidencing the Junior Debt and the Junior Creditors' Collateral will be endorsed with per notice of this Subordination Agreement as follows:

"This _____ Note is subordinated to all indebtedness now or hereafter owing by the maker to LaSalle Bank National Association, Chicago, Illinois, as provided in that certain Subordination Agreement dated as of February 28, 2003."

The Junior Creditors will promptly deliver to the Bank the original copy of the Junior :e, as well as certified copies of all other agreements, instruments and documents hereafter lencing any Junior Debt, in each case showing such endorsement.

1.8    Each Junior Creditor agrees to receive and hold in trust for and promptly i over to the Bank, in the form received (except for the endorsement or assignment by the ior Creditors where necessary), any sums at any time paid to, or received by, the Junior ditors in violation of the terms of this Subordination Agreement and to reimburse the Bank all costs, including reasonable attorney's fees, incurred by the Bank in the course of collecting sums should the Junior Creditors fail to voluntarily turn the same over to the Bank as herein iired.

1.9    Each Junior Creditor hereby irrevocably makes, constitutes and appoints 3ank (and any officer of the Bank or any person designated by the Bank for that purpose) as Junior Creditors' true and lawful proxy and attorney-in-fact (and agent-in-fact) in the Junior litors' name, place and stead, with full power of substitution, to (i) take any and all actions as permitted in this Subordination Agreement, (ii) execute such financing statements and other iments and to do such other acts as the Bank may require to perfect and preserve the Junior : and the Junior Creditors' Collateral, and (iii) carry out any remedy provided for in this ordination Agreement. The Junior Creditors hereby acknowledge that the constitution and intment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable. Junior Creditors hereby ratify and confirm all that said attorney-in-fact may do or cause to one by virtue of any provision of this Subordination Agreement.

1.10   Each Junior Creditor agrees that neither shall modify or amend any ment, instrument or document evidencing or securing the Junior Debt, including without ation the Junior Note, without the prior written consent of the Bank.

2.    Representations.

2.1    Each Junior Creditor represents and warrants to the Bank that such Junior tor has not assigned or otherwise transferred the Junior Debt or the Junior Creditors' teral, or any interest therein to any person or entity, that such Junior Creditor will make no assignment or other transfer thereof.

3

ordination Agreement-Heinzel

Case 1:08-cv-01···    Document 1-2.    Filed 03/14/20···    Page 36 of 32···

2.2    Each Junior Creditor represents and warrants to the Bank that no default or
~y event which, with the lapse of time, the giving of notice or both, would constitute a
~t under the Junior Debt or any instrument evidencing or securing the Junior Debt, has
~ed and is continuing (a *"Junior Debt Default"*), and each Junior Creditor further agrees to
~tly provide the Bank with written notice of any Junior Debt Default.

2.3    Each Junior Creditor represents and warrants to the Bank that the
~nding amount of Junior Debt evidenced by the Junior Note as of the date of this
~dination Agreement is Two Million Two Hundred Sixty Six Thousand Seven Hundred
~and 00/100 Dollars ($2,266,702.00).

3.    Further Agreements.

3.1    Each Junior Creditor expressly waives all notice of the acceptance by the
~ of the subordination and other provisions of this Subordination Agreement and all notices
~pecifically required pursuant to the terms of this Subordination Agreement, and each Junior
~itor expressly waives reliance by the Bank upon the subordination and other provisions of
~ubordination Agreement as herein provided.

3.2    Each Junior Creditor consents and agrees that all Senior Debt shall be
~ed to have been made, incurred and/or continued at the request of the Junior Creditors and
~liance upon this Subordination Agreement.

3.3    Each Junior Creditor agrees that the Bank has made no warranties or
~esentations with respect to the due execution, legality, validity, completeness or
~rceability of the documents, instruments and agreements evidencing the Senior Debt, that the
~k shall be entitled to manage and supervise its financial arrangements with the Junior
~litors in accordance with its usual practices, without impairing or affecting this
~ordination Agreement.

3.4    Each Junior Creditor agrees that the Bank shall have no liability to any
~or Creditor, and in particular, each Junior Creditor hereby waives any claim which it may
~ or hereafter have against the Bank arising out of (i) any and all actions which the Bank takes
~mits to take (including without limitation actions with respect to the creation, perfection or
~tinuation of liens or security interests in any existing or future Collateral of the Bank's,
~ons with respect to the occurrence of an event of default under any documents, instruments or
~eements evidencing the Senior Debt, actions with respect to the foreclosure upon, sale,
~ase, or depreciation of, or failure to realize upon, any of the Bank's Collateral and actions
~h respect to the collection of any claim for all or any part of the Senior Debt from any account
~tor, guarantor or other person or entity) with respect to the documents, instruments and
~eements evidencing the Senior Debt or to the collection of the Senior Debt or the valuation,
~, protection or release of the Bank's Collateral, (ii) the Bank's election (whether on behalf of
~ Bank or the Junior Creditors) in any proceeding instituted under the Bankruptcy Code, and/or
~) any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code by
~ Borrowers, as debtor-in-possession.    Notwithstanding the foregoing or anything else
~tained in this Subordination Agreement, if any payment or distribution to which the Junior
~editors would otherwise have been entitled (but for the provisions of this Subordination

8

Case 1:08-cv-01544    Document 11-2    Filed 03/14/2008    Page 57 of 82

nent) shall have been turned over to the Bank or otherwise applied to the payment of the Debt pursuant to the provisions of this Subordination Agreement, then the Junior ors shall be entitled to receive from the Bank any payment or distributions received by it in of the amount sufficient to pay all Senior Debt in full, and upon receipt by the Bank of its sufficient to pay the Senior Debt in full, the Junior Creditors shall be subrogated to all of the Bank to receive all further payments or distributions applicable to the Senior Debt the extent permitted by law, shall have the benefit of all liens and security interests of the if any, in the assets of Borrowers, until the Junior Debt shall have been paid in full.  If the Creditors have been subrogated to the rights of the Bank pursuant to the operation of this n 3.4, the Borrowers and the Bank shall take all reasonable actions requested by the Junior ors in order to enable the Junior Creditors to obtain payments from the Borrowers with t to such subrogated rights as soon as possible.

4.    Further Assurances.  The Junior Creditors agree that the Bank, at any time and time to time hereafter, may enter into such agreements with the Borrowers as the Bank may proper extending the time of payment of or renewing or otherwise altering the terms of all y of the Senior Debt or affecting any of the Bank's Collateral, and may sell or surrender or wise deal with any of the Bank's Collateral, and may release any balance of funds of the wers with the Bank, without notice to the Junior Creditors and without in any way iring or affecting this Subordination Agreement.

5.    Continuing Agreement.  This Subordination Agreement shall be irrevocable and constitute a continuing agreement of subordination and shall be binding on each Junior itor and his or her heirs, personal representatives, successors and assigns, and shall inure to enefit of the Bank, its successors and assigns until the Bank has, in writing, notified each r Creditor that all of the Senior Debt has been paid in full and all obligations arising in ection therewith have been discharged.  The Bank may continue, without notice to the r Creditors, to lend monies, extend credit and make other accommodations to or for the unt of the Borrowers on the faith hereof.  Each Junior Creditor hereby agrees that all nents received by the Bank may be applied, reversed, and reapplied, in whole or in part, to of the Senior Debt, without impairing or affecting this Subordination Agreement.

6.    No Reliance.  Each Junior Creditor hereby assumes responsibility for keeping self or herself informed of the financial condition of the Borrowers, any and all endorsers and and all guarantors of the Senior Debt and the Junior Debt, and of all other circumstances ing upon the risk of nonpayment of the Senior Debt and the Junior Debt that diligent inquiry ld reveal, and each Junior Creditor hereby agrees that the Bank shall have no duty to advise Junior Creditors of information known to the Bank regarding such condition or any such umstances or to undertake any investigation. If the Bank, in its sole discretion, undertakes, at time or from time to time, to provide any information of the type described herein to the ior Creditors, the Bank shall be under no obligation to subsequently update any such rmation or to provide any such information to the Junior Creditors on any subsequent asion.

7.    Bank's Duty Limited.  The rights granted to the Bank in this Subordination reement are solely for its protection and nothing herein contained imposes on the Bank any ies with respect to any property of either the Borrowers or of the Junior Creditors received by

8

Case 1:08-cv-01544   Document 1-2   Filed 03/14/2008   Page 38 of 52

ie Bank beyond the duty to exercise reasonable care in the custody and preservation of such roperty while in the Bank's possession. The Bank shall have no duty to preserve rights against rior parties on any instrument or chattel paper received from the Borrowers or the Junior 'reditors as collateral security for the Senior Debt or any portion thereof.

8.  <u>No Marshalling.</u>  Each Junior Creditor, on his or her own behalf and on behalf of is or her successors and assigns, hereby expressly waives all rights, if any, to require a harshalling of the Borrowers' assets by the Bank or to require that the Bank first resort to some r any portion of any collateral for the Senior Debt before foreclosing upon, selling or otherwise ealizing on any other portion thereof.

9.  <u>Reinstatement</u>. To the extent that the Borrowers make a payment to the Bank or he Bank receives any payment or proceeds of the collateral securing the Senior Debt for the Borrowers' benefit, which payment or proceeds or any part thereof are subsequently invalidated, leclared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, eceiver or any other party under any bankruptcy law, state or federal law, common law or :quitable doctrine, then, to the extent of such payment or proceeds received and not retained by he Bank, the Junior Creditors' obligations intended to be satisfied thereby and this Subordination Agreement shall be reinstated and continue in full force and effect until full and inal payment shall have been made to the Bank. Each Junior Creditor agrees to hold in trust for he Bank and promptly remit to the Bank any payments received by any Junior Creditor after such invalidated, rescinded or returned payment was originally made.

10.  <u>Waiver In Writing</u>.  No waiver shall be deemed to be made by the Bank of any of its rights hereunder unless the same shall be in writing signed on behalf of the Bank and each such waiver, if any, shall be a waiver only with respect to the specific matter or matters to which the waiver relates and shall in no way impair the rights of the Bank or the obligations of the Junior Creditors to the Bank in any other respect at any other time.

11.  <u>Choice Of Law</u>.  This Subordination Agreement shall be governed and controlled by the internal laws of the State of Illinois.

12.  <u>FORUM.</u>  TO INDUCE THE BANK TO ACCEPT THIS SUBORDINATION AGREEMENT, EACH JUNIOR CREDITOR IRREVOCABLY AGREES THAT, SUBJECT TO THE BANK'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS SUBORDINATION AGREEMENT SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS.  EACH JUNIOR CREDITOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH JUNIOR CREDITOR HEREBY IRREVOCABLY APPOINTS AND DESIGNATES THE SECRETARY OF STATE OF ILLINOIS, WHOSE ADDRESS IS SPRINGFIELD, ILLINOIS (OR ANY OTHER PERSON HAVING AND MAINTAINING A PLACE OF BUSINESS IN SUCH STATE WHOM THE JUNIOR CREDITORS MAY FROM TIME TO TIME HEREAFTER DESIGNATE UPON TEN (10) DAYS WRITTEN NOTICE TO THE BANK AND WHO THE BANK HAS AGREED IN ITS SOLE DISCRETION IN WRITING IS SATISFACTORY AND WHO HAS EXECUTED AN AGREEMENT IN FORM AND

8



3STANCE SATISFACTORY TO THE BANK AGREEING TO ACT AS SUCH
TORNEY AND AGENT), AS THE JUNIOR CREDITORS' TRUE AND LAWFUL
TORNEY AND DULY AUTHORIZED AGENT FOR ACCEPTANCE OF SERVICE OF
GAL PROCESS. EACH JUNIOR CREDITOR AGREES THAT SERVICE OF SUCH
)CESS UPON SUCH PERSON SHALL CONSTITUTE PERSONAL SERVICE OF SUCH
)CESS UPON SUCH JUNIOR CREDITOR. EACH JUNIOR CREDITOR HEREBY
IVES ANY RIGHT HE OR SHE MAY HAVE TO TRANSFER OR CHANGE THE
NUE OF ANY LITIGATION BROUGHT AGAINST THE JUNIOR CREDITORS BY THE
NK IN ACCORDANCE WITH THIS PARAGRAPH.


13.    WAIVER OF JURY TRIAL. THE JUNIOR CREDITORS AND THE BANK,
ER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH
JNSEL, EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE
EVOCABLY, THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION
PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS
3ORDINATION AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT
THE BANK GRANTING ANY FINANCIAL ACCOMMODATION TO THE
ROWERS AND ENTERING INTO THIS SUBORDINATION AGREEMENT.

8

14.    Additional Borrower Agreements.

14.1    The Borrowers hereby agree that until all Senior Debt is paid in full and
bligations arising in connection therewith have been satisfied, the Borrowers will make no
nents or distributions contrary to the provisions hereof and will do every other thing
ssary to carry out such provisions. The Borrowers will give the Bank notice of any suit or
n brought in violation of said agreement.

14.2    Each Borrower represents and warrants to the Bank that no Junior Debt
ult exists and agrees to promptly provide the Bank with written notice of any Junior Debt
ult.

14.3    In the event of any violation of any of the provisions of this Subordination
ement, then, at the election of the Bank, any and all obligations of the Borrowers to the
: shall immediately become due and payable and any and all agreements of the Bank to
: loans, advances or other financial accommodations to the Borrowers shall immediately
nate, notwithstanding any provision hereof to the contrary.

[SIGNATURE PAGE FOLLOWS]

bordination Agreement-Heinzel

IN WITNESS WHEREOF, the Junior Creditors, the Bank and the Borrowers have executed this Subordination Agreement as of the date set forth above.

JUNIOR CREDITORS:

_____
Robert Heinzel

_____
Elizabeth Heinzel

BANK:

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By: _____
Name: Michael F. Stengel
Title: Vice President

8

# EXHIBIT D

Rx Date/Time    MAR-10-2008(MON) 11:41                                 P. 002
MAR. 10. 2008 11:18AM   LASALLE BANK                    NO. 3497   P. 2

### WAIVER AND FIFTH AMENDMENT
### TO LOAN AND SECURITY AGREEMENT
### AND REAFFIRMATION OF GUARANTIES
### AND SUBORDINATION AGREEMENTS

This WAIVER AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT AND REAFFIRMATION OF GUARANTIES AND SUBORDINATION AGREEMENTS dated as of October 30, 2004 (the *"Fifth Amendment"*), is entered into by and among Illinois Industrial Tool, Inc. (f/k/a Midwest Tool Distributors, Inc. and d/b/a JMK/IIT Inc.), an Illinois corporation whose address is 8811 South 77th Avenue, Bridgeview, Illinois 60455 (*"IIT"*), JMK SALES, INC., a Wisconsin corporation whose address is 9815-9817 S. 13th St., Oak Creek, WI 53154 (*"JMK"*, and together with IIT, the *"Borrowers"* and each individually a *"Borrower"*); the following guarantors and junior creditors: Christopher Anthony, an individual whose address is 302 Ambriance, Burr Ridge, Illinois, and Lance Ericson, an individual whose address is 22549 Deerpath Lane, Plainfield, IL 60544 (each a *"Guarantor"* and collectively the *"Guarantors"*); the following junior creditors: Randal Zahora, whose address is 14139 S. King Road, Lockport, Illinois, 60441, Robert Heinzel, an individual, and Elizabeth Heinzel, an individual, who both reside at 11917 Indian Trail, Hales Corners, Wisconsin, 53130 (together, the *"Heinzels"*; and together with Randal Zahora, Christopher Anthony and Lance Ericson, the *"Junior Creditors"*, and each individually a *"Junior Creditor"*), and LASALLE BANK NATIONAL ASSOCIATION, a national banking association (the *"Bank"*), whose address is 135 South LaSalle Street, Chicago, Illinois 60603.

### RECITALS:

A.    The Borrowers and the Bank entered into that certain Loan and Security Agreement dated as of February 28, 2003 (the *"Original Loan Agreement"*) as modified and amended by (i) that certain Amendment to Loan and Security Agreement and Reaffirmation of Guaranties and Subordination Agreements dated as of July 16, 2003 (the *"First Amendment"*), (ii) that certain Second Amendment to Loan and Security Agreement and Reaffirmation of Guaranties and Subordination Agreements dated as of February 17, 2004 (the *"Second Amendment"*), and (iii) that certain Waiver and Third Amendment to Loan and Security Agreement and Reaffirmation of Guaranties and Subordination Agreements dated as of July 30, 2004 (the *"Third Amendment"*), and (iv) that certain Fourth Amendment to Loan And Security Agreement and Reaffirmation of Guaranties and Subordination Agreements dated as of August 30, 2004 (the *"Fourth Amendment"*) (the Original Loan Agreement, as modified by the First Amendment, Second Amendment, Third Amendment, and Fourth Amendment is referred herein as the *"Loan Agreement"*), pursuant to which Loan Agreement the Bank has made to the Borrowers (i) a Revolving Loan evidenced by that certain Revolving Note dated as of August 30, 2004 in the maximum principal amount of Eight Million and 00/100 Dollars ($8,000,000.00)(the *"Revolving Note"*) and (ii) a Capex Loan evidenced by that certain Capex Note dated as of February 17, 2004 in the maximum principal amount of Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) (the *"Capex Note"*), both executed by the Borrowers and made payable to the order of the Bank.

FIN//222201 Fifth Amendment-IIT

Rx Date/Time    MAR-10-2008(MON) 11:41                                P. 003
MAR. 10. 2008 11:18AM    LASALLE BANK                      NO. 3497   P. 3

B.      In connection with the Loan Agreement, the Guarantors executed and delivered to the Bank that certain Continuing Unconditional Guaranty dated as of February 28, 2003 in favor of the Bank (the *"Guaranty"*).

C.      In connection with the Loan Agreement, each Junior Creditor executed and delivered to the Bank a Subordination Agreement, each dated as of February 28, 2003, in favor of the Bank (each being referred to herein as a *"Subordination Agreement"*, and collectively as the *"Subordination Agreements"*).

D.      At the present time the Borrowers, Guarantors, and Junior Creditors request, and the Bank is agreeable to, (i) extending the Revolving Loan Maturity Date, and (ii) the Bank's waiver of violations by the Borrowers of certain financial covenants set forth in Section 10 of the Loan Agreement, pursuant to the terms and conditions hereinafter set forth.. The Junior Creditors execute this Fifth Amendment only in their capacity as subordinated debt holders.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Borrowers, the Guarantors, the Junior Creditors and the Bank hereby agree as follows:

## A G R E E M E N T S :

1.   <u>RECITALS</u>.  The foregoing Recitals are hereby made a part of this Fifth Amendment.

2.   <u>DEFINITIONS</u>.  Capitalized words and phrases used herein without definition shall have the respective meanings ascribed to such words and phrases in the Loan Agreement.

3.   <u>AMENDMENTS TO THE LOAN AGREEMENT</u>.

3.1    <u>Amendment to Add Definition</u>.  The following definitions are hereby added to Section 1.1 of the Loan Agreement in the appropriate alphabetical order:

*"Heinzel Subordinated Note"* shall mean that certain Promissory Note dated as of September 24, 2002, executed by IIT and payable to Robert Heinzel, an individual, and Elizabeth Heinzel, an individual (the *"Heinzels"*), who both reside at 11917 Indian Trail, Hales Corners, Wisconsin, 53130, in the original principal amount of Two Million Two Hundred Sixty-Six Thousand Seven Hundred Two Dollars ($2,266,702.00).

*"Permitted Heinzel Payments"* shall refer to (i) any and all interest payments due under the Heinzel Subordinated Note at a rate of six percent (6%) and (ii) that amount of principal the Bank has agreed to allow IIT to repay on the Subordinated Debt outstanding under the Heinzel Subordinated Note determined in accordance with the Borrowers' corresponding EBITDA value for Borrowers' fiscal year 2005 as set forth in the following table, which payment, if any, shall be paid within thirty (30) days of the Bank's receipt of the Borrower's 2005 year end financial statements:

2

Rx Date/Time    MAR-10-2008(MON) 11:41
MAR. 10. 2008 11:18AM    LASALLE BANK    NO. 3497    P. 4

P. 004

| Borrowers' FY 2005 EBITDA | $1,700,000 | $1,800,000 | $1,900,000 | $2,000,000 |
|---|---|---|---|---|
| Permitted Heinzel Payment | $220,000 | $300,000 | $380,000 | Balance outstanding |

"*Permitted Payments*" shall mean, collectively, the Permitted Heinzel Payments and the Permitted Zahora Payments.

"*Permitted Zahora Payments*" shall refer to (i) any and all interest payments due under the Zahora Subordinated Note at a rate of six percent (6%) and (ii) following payment of any Permitted Heinzel Payments, that amount of principal the Bank has agreed to allow IIT to repay on the Subordinated Debt outstanding under the Zahora Subordinated Note determined in accordance with the Borrowers' corresponding EBITDA value for Borrowers' fiscal year 2005 as set forth in the following table:

| Borrowers' FY 2005 EBITDA | $2,100,000 | $2,200,000 | $2,300,000 | $2,400,000 | $2,500,000 | $2,600,000 |
|---|---|---|---|---|---|---|
| Permitted Zahora Payments | $80,000 | $160,000 | $240,000 | $320,000 | $400,000 | Balance outstanding |

"*Readers Proceeds*" shall mean the sale price for the proceeds of the Readers Transaction as agreed upon by the Heinzels and the Borrowers.

"*Readers Transaction*" shall mean the sale of the Borrowers' product line known as "Readers and Sunglasses" agreed upon by the Borrowers and the Heinzels.

"*Zahora Subordinated Note*" shall mean that certain Promissory Note executed by IIT on behalf of Randal Zahora, an individual whose address is 14139 S. King Road, Lockport, Illinois, 60441, in the original principal amount of Five Hundred Thousand Dollars ($500,000.00).

3.2    Amendments to Existing Definitions.

(a)    Subsection (b) of the definition of "Eligible Accounts" is hereby deleted in its entirety with the following text inserted in lieu thereof:

"(b)    are evidenced by an invoice delivered to the Account Debtor thereunder, are due and payable within ninety (90) days (or, in the case of an otherwise Eligible Account billed through Ace Hardware Corporate, within one hundred

2

Rx Date/Time    MAR-10-2008(MON) 11:41                                    P. 005
MAR. 10. 2008 11:18AM    LASALLE BANK                        NO. 3497    P. 5

twenty (120) days) after the date of the invoice or shipment of the Inventory referred to in the invoice, whichever is later;"

(b)    Subsection (d) of the definition of "Eligible Inventory" is hereby deleted in its entirety with the following text inserted in lieu thereof:

"(d)    is not unacceptable to the Bank, in its sole and absolute discretion, due to age, type, category, and/or quality and in any event shall not include (i) merchandising racks or pallets, (ii) seasonal items in inventory for over one (1) year, (iii) discontinued items in inventory for over six (6) months, or (iv) defective items;"

### 3.3    Amendments to the Revolving Loan.

(a)    *Revolving Loan Maturity Date.*  The definition of "Revolving Loan Maturity Date" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"*Revolving Loan Maturity Date*" shall mean October 30, 2005, unless extended by the Bank pursuant to any modification, extension or renewal note executed by the Borrowers and accepted by the Bank in its sole and absolute discretion in substitution for the Revolving Note.

(b)    *Revolving Note.*  All references in the Loan Agreement to the Revolving Note are hereby amended to refer to the Replacement Revolving Note attached hereto as *Exhibit A.*

### 3.4    Amendments to Financial Covenants.

(a)    *Tangible Net Worth.*  Section 10.1 of the Loan Agreement is hereby deleted in its entirety and the following text inserted in lieu thereof:

"10.1    Tangible Net Worth.

The Borrowers shall maintain consolidated Tangible Net Worth as of (a) December 31, 2004, of not less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) and (b) as of June 30, 2005 at all times thereafter, of not less than Five Hundred Fifty Thousand and 00/100 Dollars ($550,000.00), to be tested as of June 30 and December 31 of each year."

(b)    *Subordinated Debt.*  Section 10.2 of the Loan Agreement is hereby deleted in its entirety and the following text inserted in lieu thereof:

"10.2    Subordinated Debt.

The Borrowers shall have consolidated Subordinated Debt (a) as of November 30, 2004, of not less than Two Million Five Hundred Ninety Thousand and 00/100 Dollars ($2,590,000.00), and (b) as of December 31, 2004 and at all times thereafter, of not less than Two Million Six Hundred Twenty Thousand and 00/100 Dollars ($2,620,000.00) (the "FY 2004 Sub Debt"); provided however, that following consummation of the Readers Transaction, Borrowers'

2

Rx Date/Time    MAR-10-2008(MON) 11:41                                    P. 006
MAR. 10. 2008 11:18AM    LASALLE BANK                        NO. 3497    P. 6

consolidated Subordinated Debt shall not be less than the FY 2004 Sub Debt **minus** the Readers Proceeds (the "Remaining Difference"); and provided further that upon receipt by the Bank of Borrowers' financial statements for Borrowers' fiscal year 2005 and upon certification by the Bank that Borrowers are in compliance with all financial covenants set forth in this Section 10, Borrowers' consolidated Subordinated Debt shall not be less than the Remaining Difference **minus** any Permitted Payments; provided that, according to the Bank's sole judgment, making such Permitted Payments will not result in an Event of Default under this Agreement.

Notwithstanding anything to the contrary set forth in the Second Amendment or any other correspondence between the Heinzels and the Bank, no principal payments other than Permitted Payments shall be permitted on the Subordinated Debt without prior approval of the Bank and any principal payment made on the Subordinated Debt other than the Permitted Payments without prior approval of the Bank shall be an Event of Default under Section 11.5 of this Agreement."

(c)    *Debt Service Coverage.*   Section 10.3 of the Loan Agreement is hereby deleted in its entirety and the following text inserted in lieu thereof:

"10.3   Debt Service Coverage.

At the end of each fiscal year, the Borrowers shall maintain a ratio of (a) consolidated EBITDAR for such period, to (b) the sum of (i) Interest Charges (including Subordinated Debt) for such period, **plus** (ii) the aggregate amount of principal payments on Indebtedness paid or accrued for such period, **plus** (iii) the sum of all federal, state and local taxes paid or accrued for such period, **plus** (iv) the aggregate amount of unfunded Capital Expenditures during such period **plus** (v) the sum of Interest Charges and the aggregate amount of principal payments on Indebtedness paid by MT Financial according to the terms and definitions of the MT Financial Agreement for such period, of not less than 1.25:1.00."

4.    REAFFIRMATION OF GUARANTIES.   Each Guarantor hereby expressly (a) consents to the execution by the Borrowers and the Bank of this Fifth Amendment, (b) acknowledges that the "Guaranteed Debt" (as defined in the Guaranty) includes all of the obligations and liabilities owing from the Borrowers to the Bank, including, but not limited to, the obligations and liabilities of the Borrowers to the Bank under and pursuant to the Loan Agreement, as amended from time to time, and as evidenced by the Notes, including the Replacement Revolving Note, as modified, extended and/or replaced from time to time, (c) reaffirms, assumes and binds himself in all respects to all of the obligations, liabilities, duties, covenants, terms and conditions that are contained in the Guaranty, (d) agrees that all such obligations and liabilities under the Guaranty shall continue in full force and effect and shall not be discharged, limited, impaired or affected in any manner whatsoever, and (e) represents and warrants that each of the representations and warranties made by such Guarantor in any of the documents executed in connection with the Loans remain true and correct as of the date hereof.

2

Rx Date/Time      MAR-10-2008(MON) 11:41                                        P. 007
        MAR. 10. 2008 11:19AM    LASALLE BANK                          NO. 3497   P. 7

5.  **SUBORDINATION AGREEMENTS.**  Each Junior Creditor hereby expressly (a) consents to the execution by the Borrowers and the Bank of this Fifth Amendment, (b) acknowledges that the "Senior Debt" (as defined in each of the Subordination Agreements) includes all of the obligations and liabilities owing from the Borrowers to the Bank, including, but not limited to, the obligations and liabilities of the Borrowers to the Bank under and pursuant to the Loan Agreement, as amended from time to time, and as evidenced by the Notes, including the Replacement Revolving Note, as modified, extended and/or replaced from time to time, (c) acknowledges that the Junior Debt (as defined in each of the Subordination Agreements) and the Junior Lender's Collateral (as defined in each of the Subordination Agreements) shall remain subordinate to the Senior Debt and the Senior Lender's Collateral (as defined in each of the Subordination Agreements), (d) reaffirms, assumes and binds himself or herself in all respects to all of the obligations, liabilities, duties, covenants, terms and conditions that are contained in his or her respective Subordination Agreement, (e) agrees that such all obligations and liabilities under his or her respective Subordination Agreement shall continue in full force and effect and shall not be discharged, limited, impaired or affected in any manner whatsoever, and (f) represents and warrants that each of the representations and warranties made by such Junior Creditor in any of the documents executed in connection with the Loans remain true and correct as of the date hereof.

6.  **WAIVER OF DEFAULTED COVENANTS AND CONSENT.**

     6.1  <u>Waiver</u>.  The Borrowers have informed the Bank that for the fiscal period ending June 30, 2004 (i) the Borrowers' Tangible Net Worth was less than the required Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) set forth in Section 10.1 of the Loan Agreement, and as such the Borrowers failed to comply with the Tangible Net Worth covenant set forth in said Section 10.1 for such period and (ii) Borrower made principal payments to Christopher Anthony in the amount of Thirty Thousand and 00/100 Dollars ($30,000.00) in violation of the terms of his Subordination Agreement (the *"Defaulted Covenants"*).  The Borrowers, the Guarantors and the Junior Creditors agree and acknowledge that, as a result of the occurrence of such Defaulted Covenants, an Event of Default has occurred and is continuing under Section 11 of the Loan Agreement.  The Borrowers, the Guarantors and the Junior Creditors have therefore requested that the Bank waive compliance by the Borrowers with the Defaulted Covenants for the fiscal periods set forth above, as well as the resulting Event of Default.

     The Bank hereby waives:  (a) compliance by the Borrowers with the Defaulted Covenants for the fiscal period set forth above, (b) the Events of Default occurring by reason of the Borrowers' failure to comply with the Defaulted Covenants solely for the fiscal period set forth above, and (c) the Bank's remedies under the Loan Agreement with respect to the Defaulted Covenants and the subsequent Events of Default.  This waiver shall be narrowly construed and shall neither extend to any other violations under, or default of, the Loan Agreement, including but not limited to, a violation of the Tangible Net Worth covenant for any future period of time or any principal payments made under any of the Subordination Agreements, nor shall this waiver prejudice any rights or remedies which the Bank may have or be entitled to with respect to such future violations or defaults.

     6.2  <u>Consent</u>.  Notwithstanding anything to the contrary contained herein, the Bank hereby consents to the following:

FDN/222201 Fifth Amendment-IIT

Rx Date/Time    MAR-10-2008(MON) 11:41    P. 008
MAR. 10. 2008 11:19AM    LASALLE BANK    NO. 3497  P. 8

(a)    the payment, on or before December 31, 2004, of all interest due and owing pursuant to the terms of the Heinzel Subordinated Note as of December 31, 2004;

(b)    the consummation of the Readers Transaction and the application of the Readers Proceeds to the outstanding principal balance of the Heinzel Subordinated Note upon consummation of the Readers Transaction; and

(c)    the payment of the Permitted Payments.

7.    REPRESENTATIONS AND WARRANTIES.  To induce the Bank to enter into this Fifth Amendment, each Borrower hereby certifies, represents and warrants to the Bank that:

7.1    Organization.  Each of the Borrowers is a corporation duly organized, existing and in good standing under the laws of the State of Illinois, with full and adequate corporate power to carry on and conduct its business as presently conducted. Each Borrower is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities require such qualification or licensing. Neither the Articles of Incorporation nor the Bylaws of either Borrower have been changed or amended since the most recent date that certified copies thereof were delivered to the Bank.  The exact legal name of each Borrower is as set forth in the preamble of this Fifth Amendment, and neither Borrower conducts, nor has it during the last five (5) years conducted, business under any other name or trade name.  Neither Borrower will change its name, its organizational identification number, if it has one, its type of organization, its jurisdiction of organization or other legal structure without providing prior notice to the Bank of such change.

7.2    Authorization.  Each of the Borrowers is duly authorized to execute and deliver this Fifth Amendment and is and will continue to be duly authorized to borrow monies under the Loan Agreement, as amended hereby, and to perform its obligations under the Loan Agreement, as amended hereby.

7.3    No Conflicts.  The execution and delivery of this Fifth Amendment and the performance by each Borrower of its obligations under the Loan Agreement, as amended hereby, do not and will not conflict with any provision of law or of the articles of incorporation or bylaws of such Borrower or of any agreement binding upon such Borrower.

7.4    Validity and Binding Effect.  The Loan Agreement, as amended hereby, is a legal, valid and binding obligation of the Borrowers, enforceable against the Borrowers in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies.

7.5    Compliance with Loan Agreement.  The representation and warranties set forth in Section 7 of the Loan Agreement, as amended hereby, are true and correct with the same effect as if such representations and warranties had been made on the date hereof, with the exception that all references to the financial statements shall mean the financial statements most recently delivered to the Bank and except for such changes as are specifically permitted under the Loan Agreement.  In addition, except for the Defaulted Covenants, the Borrowers have complied with and are in compliance with all of the covenants set forth in the Loan Agreement,

FIN//222201 Fifth Amendment-IIT

2

Rx Date/Time          MAR-10-2008(MON) 11:41
MAR. 10. 2008 11:19AM          LASALLE BANK          NO. 3497   P. 9    P. 009

as amended hereby, including, but not limited to, those set forth in Section 8, Section 9 and Section 10 thereof.

7.6   No Event of Default. As of the date hereof and except for the Event of Default occurring as a result of the Defaulted Covenant, no Event of Default under Section 11 of the Loan Agreement, as amended hereby, or event or condition which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, has occurred or is continuing.

7.7   No Subordinated Debt Default. As of the date hereof and except for the default under the Christopher Anthony Subordination Agreement discussed above in Section 6 of this Fifth Amendment, no default under any of the documents evidencing or securing any of the Junior Debt, or event or condition which, with the giving of notice or the passage of time, or both, would constitute a default under any of the documents evidencing or securing any of the Junior Debt, has occurred or is continuing.

8.   CONDITIONS PRECEDENT. This Fifth Amendment shall become effective as of the date above first written after receipt by the Bank of the following documents:

8.1   Fifth Amendment. This Fifth Amendment executed by the Borrowers, the Guarantors, the Junior Creditors and the Bank.

8.2   Replacement Revolving Note. A Replacement Revolving Note dated as of October 30, 2004 in the maximum principal amount of Eight Million and 00/100 Dollars ($8,000,000.00), executed by the Borrowers and made payable to the order of the Bank, in the form of *Exhibit A* attached hereto.

8.3   Covenant Waiver Fee. The Borrower agrees to pay to the Bank a covenant waiver fee in the amount of Two Thousand Five Hundred and 00/100 Dollars ($2,500.00).

8.4   Other Documents. Such other documents, certificates and/or opinions of counsel as the Bank may request.

9.   GENERAL.

9.1   Governing Law: Severability. This Fifth Amendment shall be construed in accordance with and governed by the laws of Illinois. Wherever possible each provision of the Loan Agreement and this Fifth Amendment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement and this Fifth Amendment shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Loan Agreement and this Fifth Amendment.

9.2   Successors and Assigns. This Fifth Amendment shall be binding upon the Borrowers, the Guarantors, the Junior Creditors and the Bank and their respective successors and assigns, and shall inure to the benefit of the Borrowers, the Guarantors, the Junior Creditors and the Bank and the successors and assigns of the Bank.

FIN//222201 Fifth Amendment-IIT          2

Rx Date/Time      MAR-10-2008(MON) 11:41                                    P. 010
   MAR. 10. 2008 11:19AM    LASALLE BANK                      NO. 3497  P. 10

9.3    Continuing Force and Effect of Loan Documents, Guaranty and Subordination Agreements. Except as specifically modified or amended by the terms of this Fifth Amendment, all other terms and provisions of the Loan Agreement and the other Loan Documents are incorporated by reference herein, and in all respects, shall continue in full force and effect. Each of the Borrowers, by execution of this Fifth Amendment, hereby reaffirms, assumes and binds itself to all of the obligations, duties, rights, covenants, terms and conditions that are contained in the Loan Agreement and the other Loan Documents. The Guarantors, by execution of this Fifth Amendment, hereby reaffirm, assume and bind themselves to all of the obligations, duties, rights, covenants, terms and conditions that are contained in the Guaranty. The Junior Creditors, by execution of this Fifth Amendment, hereby reaffirm, assume and bind themselves to all of the obligations, duties, rights, covenants, terms and conditions that are contained in their respective Subordination Agreements.

9.4    References to Loan Agreement. Each reference in the Loan Agreement to "this Agreement", "hereunder", "hereof", or words of like import, and each reference to the Loan Agreement in any and all instruments or documents delivered in connection therewith, shall be deemed to refer to the Loan Agreement, as amended hereby.

9.5    Expenses. The Borrowers shall pay all costs and expenses in connection with the preparation of this Fifth Amendment and other related loan documents, including, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of the Bank or any affiliate or parent of the Bank. The Borrowers shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Fifth Amendment and the other instruments and documents to be delivered hereunder, and agrees to save the Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.

9.6    Counterparts. This Fifth Amendment may be executed in any number of counterparts, all of which shall constitute one and the same agreement.


[SIGNATURE PAGE FOLLOWS]

Rx Date/Time    MAR-10-2008(MON) 11:41           P. 011
MAR. 10. 2008 11:20AM    LASALLE BANK      NO. 3497   P. 11

IN WITNESS WHEREOF, the parties hereto have executed this Waiver and Fifth Amendment to Loan and Security Agreement and Reaffirmation of Guaranties and Subordination Agreements as of the date first above written.

**BORROWERS:**

ILLINOIS INDUSTRIAL TOOL, INC.,
an Illinois corporation

By: _____
Name: Christopher Anthony
Title: Chief Executive Officer

JMK SALES, INC.
a Wisconsin corporation

By: _____
Name: Christopher Anthony
Title: CEO

**BANK:**

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By: _____
Name: Michael T. Gage
Title: First Vice President

**JUNIOR CREDITORS:**

_____
Robert Heinzel

_____
Elizabeth Heinzel

_____
Randal Zahora

**GUARANTORS AND JUNIOR CREDITORS:**

_____
Lance Ericson

_____
Christopher Anthony

FIN//222201 Fifth Amendment-IIT

# REVOLVING NOTE

$8,000,000.00
Chicago, Illinois

Date: as of October 30, 2004
Due Date: October 30, 2005

FOR VALUE RECEIVED, Illinois Industrial Tool, Inc., (f/k/a Midwest Tool Distributors, Inc. and d/b/a JMK/IIT Inc.) an Illinois corporation whose address is 8811 South 77th Avenue, Bridgeview, Illinois 60455 ("*IIT*"), JMK Sales, Inc., a Wisconsin corporation whose address is 8811 South 77th Avenue, Bridgeview, Illinois 60455, ("*JMK*", and together with IIT, the "*Borrowers*" and each individually a "*Borrower*"), promise to pay to the order of LaSalle Bank National Association, a national banking association (hereinafter, together with any holder hereof, called the "*Bank*"), whose address is 135 South La Salle Street, Chicago, Illinois 60603, on or before October 30, 2005 (the "*Revolving Loan Maturity Date*"), the lesser of (i) the principal sum of EIGHT MILLION and 00/100 DOLLARS ($8,000,000.00), or (ii) the aggregate principal amount of all Revolving Loans outstanding under and pursuant to that certain Loan Agreement dated as of February 28, 2003, executed by and among the Borrowers and the Bank, as amended from time to time (as amended, supplemented or modified from time to time, the "*Loan Agreement*"), and made available by the Bank to the Borrowers at the maturity or maturities and in the amount or amounts stated on the records of the Bank, together with interest (computed on the actual number of days elapsed on the basis of a 360-day year) on the aggregate principal amount of all Revolving Loans outstanding from time to time as provided in the Loan Agreement. Capitalized words and phrases not otherwise defined herein shall have the meanings assigned thereto in the Loan Agreement.

This Revolving Note evidences the Revolving Loans, Letters of Credit and other indebtedness incurred by the Borrowers under and pursuant to the Loan Agreement, to which reference is hereby made for a statement of the terms and conditions under which the Revolving Loan Maturity Date or any payment hereon may be accelerated. The holder of this Revolving Note is entitled to all of the benefits and security provided for in the Loan Agreement. All Revolving Loans shall be repaid by the Borrowers on the Revolving Loan Maturity Date, unless payable sooner pursuant to the provisions of the Loan Agreement.

Principal and interest shall be paid to the Bank at its address set forth above, or at such other place as the holder of this Revolving Note shall designate in writing to the Borrowers. Each Revolving Loan made, and all Letters of Credit issued by, the Bank, and all payments on account of the principal and interest thereof shall be recorded on the books and records of the Bank and the principal balance as shown on such books and records, or any copy thereof certified by an officer of the Bank, shall be rebuttably presumptive evidence of the principal amount owing hereunder.

Except for such notices as may be required under the terms of the Loan Agreement, each Borrower waives presentment, demand, notice, protest, and all other demands, or notices, in connection with the delivery, acceptance, performance, default, or enforcement of this Revolving Note, and assents to any extension or postponement of the time of payment or any other indulgence.

FIN//222201 IIT Replacement Revolving Note

Rx Date/Time       MAR-10-2008(MON) 11:41
MAR. 10. 2008 11:20AM    LASALLE BANK INDUSTRIAL TOOL                    NO. 3497   P. 13    P. 013
                                                                         Y082339380       P. 02
DEC-15-2004 02:08  FROM:ILLINOIS INDUSTRIAL  7085971454      TO:17887777218  PAGE  01
                                                                                       P:3

This Revolving Note constitutes a renewal and restatement of, and replacement and substitution for, that certain Revolving Note dated as of August 30, 2004, in the amount of the lesser of (i) the principal sum of Eight Million and 00/100 Dollars ($8,000,000.00), or (ii) the aggregate principal amount of all Loans outstanding under and pursuant to that certain Loan Agreement dated as of February 28, 2003, executed by the Borrowers and made payable to the order of the Bank (the "Prior Note"). The indebtedness evidenced by the Prior Note is continuing indebtedness evidenced hereby, and nothing herein shall be deemed to constitute a payment, settlement or novation of the Prior Note, or to release or otherwise adversely affect any lien, mortgage or security interest securing such indebtedness or any rights of the Bank against any guarantor, surety or other party primarily or secondarily liable for such indebtedness.

The Revolving Loans and the Letters of Credit evidenced hereby have been made and/or issued and this Revolving Note has been delivered at the Bank's main office set forth above. This Revolving Note shall be governed and construed in accordance with the laws of the State of Illinois, in which state it shall be performed, and shall be binding upon each Borrower, and each of such Borrower's legal representatives, successors, and assigns. Wherever possible, each provision of the Loan Agreement and this Revolving Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement or this Revolving Note shall be prohibited by or be invalid under such law, such provision shall be severable, and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of the Loan Agreement or this Revolving Note. The term "Borrower" as used herein shall mean all parties signing this Revolving Note, and each one of them, and all such parties, their respective successors and assigns, shall be jointly and severally obligated hereunder.

IN WITNESS WHEREOF, the Borrowers have executed this Replacement Revolving Note as of the date set forth above.

ILLINOIS INDUSTRIAL TOOL, INC.,
an Illinois corporation

By: _____
Name: Christopher Anthony
Title: Chief Executive Officer

JMK SALES, INC.,
a Wisconsin corporation

By: _____
Name: Christopher Anthony
Title: CEO

FTW/222231 FF Replacement Revolving Note

# EXHIBIT E

MAY.09.2007 10:05                                                           #5306 P.002/006

## COVENANT NOT TO COMPETE

THIS COVENANT NOT TO COMPETE, effective this ___ day of September, 2002, is made and entered into by and between ROBERT HEINZEL, an individual, and JMK SALES, INC., a Wisconsin corporation, and ILLINOIS INDUSTRIAL TOOL, INC., an Illinois corporation.

WHEREAS, as a material inducement to ROBERT HEINZEL to consummate the Agreement dated the 16th day of August, 2002, ROBERT HEINZEL hereby agrees not to compete directly or indirectly with JMK SALES, INC. or ILLINOIS INDUSTRIAL TOOL, INC. in accordance with the terms set out below; and

WHEREAS, the provisions of the covenant not to compete as set out below are necessary and proper to protect JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC. and its products of which ROBERT HEINZEL has knowledge thereof.

NOW, THEREFORE, in consideration of the promises and other good and valuable consideration as set out in the Agreement, ROBERT HEINZEL covenants to JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC. as follows:

1.   Covenants.

ROBERT HEINZEL covenants and agrees that, for a period of five (5) years after the effective date of this Covenant Not to Compete, he will neither directly or indirectly manage, own or operate a business engaged in the wholesale distribution of discount tools, sunglasses, baseball hats and other "close-out" items currently distributed by JMK SALES, INC. to customers located within the United States or be employed as a Sales Manager of, or furnish similar services to, a competitor of JMK SALES, INC. doing business in the United States and

N:\DOCS\18781\039R2\BJS4900.DOC

MAY.09.2007 10:06                                                    #5306 P.003/006

further covenants and agrees that, for a period of five (5) years after the effective date of this Covenant Not to Compete, he will not directly or indirectly divert or attempt to divert any customers or suppliers of JMK SALES, INC. to any competitor of JMK SALES, INC. doing business in the United States.

2.    Acknowledgment of Reasonableness.

ROBERT HEINZEL acknowledges and admits that the covenants in Section 1 are reasonable and necessary to protect the value of the assets of JMK SALES, INC., including its goodwill, and that compliance with these covenants will not unduly preclude ROBERT HEINZEL from maintaining his livelihood or being gainfully employed or occupied.

3.    Remedies.

ROBERT HEINZEL acknowledges and admits that a breach of the covenants in Section 1 may cause and result in irreparable and continuing harm to JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC. for which JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC. may have no adequate remedy at law. ROBERT HEINZEL accordingly agrees that, in the event of any breach of any of the covenants in Section 1, JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC. and their successor or assigns may be entitled to injunctive relief against ROBERT HEINZEL that enforces the covenants in Section 1 as a necessary and proper remedy for any such breach, as well as such additional remedies and relief as may be proper at law or in equity.

MAY.09.2007 10:06

#5306 P.004/006

4.    Severability.

The provisions of this Covenant Not to Compete are severable and independent and shall be interpreted and applied consistently with requirements of reasonableness and equity. If any provision of this Covenant Not to Compete shall be held by a forum of competent jurisdiction to be invalid or otherwise unenforceable, in part or in whole, the remaining provisions of this Covenant Not to Compete shall not be affected thereby, and any such provision found to be invalid or unenforceable shall be modified to the minimum extent permitted by law or equity to preserve the intent of the parties hereto and the value of the assets, including the goodwill pursuant to the Agreement.

5.    Choice of Law.

This Covenant Not to Compete shall be governed by and construed in accordance with the law of the State of Wisconsin.

6.    Modification.

Except as provided below, this Covenant Not to Compete may not be assigned, changed, modified, released, discharged, abandoned or otherwise amended, in part or in whole, except by instrument in writing signed by each of the parties (ROBERT HEINZEL and JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC.).

7.    Succession.

This Covenant Not to Compete shall be binding upon the executors, administrators or other legal representatives of either or both of ROBERT HEINZEL and JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC.

3

MAY.09.2007 10:06

#5306 P.005/006

and their respective successors and assigns. ROBERT HEINZEL agrees that he shall not, for a period of five (5) years after the effective date of this Covenant Not to Compete, disclose any proprietary information of JMK SALES, INC. or ILLINOIS INDUSTRIAL TOOL, INC. to his heirs or related parties to enable said heirs or parties to compete with JMK SALES, INC. or ILLINOIS INDUSTRIAL TOOL, INC.

8.  Termination.

Notwithstanding anything to the contrary contained herein, any and all obligations of ROBERT HEINZEL pursuant to this Covenant Not to Compete shall terminate and expire immediately, without notice or further action, upon any breach of the obligations of ILLINOIS INDUSTRIAL TOOL, INC. pursuant to the Stock Purchase Agreement or the breach of any terms of any documents delivered in connection therewith (including, without limitation, any failure to pay when due any of the Purchase Price or any other amounts due under the Agreement or the Note) or the breach of any of the obligations of ILLINOIS INDUSTRIAL TOOL, INC. or JMK SALES, INC. pursuant to the Employment Agreement between JMK SALES, INC. and ROBERT W. HEINZEL of even date herewith (including, without limitation, any failure to pay any compensation due ROBERT HEINZEL thereunder).

9.  Attorneys' Fees.

In the event of an action to enforce or to interpret this Covenant Not to Compete, and any terms or conditions hereof, the prevailing party shall be entitled to recovery of its reasonable attorneys' fees and costs from the other party.

4

MAY.09.2007 10:07                                        #5306 P.006/006

10.    Entire Agreement

This Covenant Not to Compete represents the entire agreement of ROBERT HEINZEL, JMK SALES, INC. and ILLINOIS INDUSTRIAL TOOL, INC. with respect to the subject matter hereof.    All other agreements, understandings, negotiations, representations and statements, whether oral or written, with respect to the subject matter hereof are merged herein.

JMK SALES, INC.

By: _____
      Authorized agent

ILLINOIS INDUSTRIAL TOOL, INC.

By: _____
      Authorized agent

_____
ROBERT HEINZEL

# EXHIBIT F

AMENDMENT TO
COVENANT NOT TO COMPETE

THIS AMENDMENT TO COVENANT NOT TO COMPETE, effective this 2nd day of February, 2005, is made and entered into by and among ROBERT HEINZEL, an individual ("Heinzel"), JMK SALES, INC., a Wisconsin corporation ("JMK"), and ILLINOIS INDUSTRIAL TOOL, INC., an Illinois corporation ("IIT").

WHEREAS, Diamond Visions, Inc., a Wisconsin corporation ("DVI") and IIT are party to an Asset Purchase Agreement of even date herewith;

WHEREAS, the parties hereto are party to that certain Covenant Not to Compete dated September 24, 2002 (the "Covenant Not to Compete");

WHEREAS, DVI intends to engage in the business of the distribution of sunglasses, reading glasses and other novelty items and Heinzel is an owner of DVI, which would violate the terms of the Covenant Not to Compete.

WHEREAS, the parties hereto desire to amend the Covenant Not to Compete to allow DVI to purchase certain assets of IIT pursuant to the Asset Purchase Agreement and to allow Heinzel to own and operate DVI from and after the date hereof without violating the terms of the Covenant Not to Compete.

NOW, THEREFORE, in consideration of the promises contained herein, and other good and valuable consideration, the parties hereby agree that the Covenant Not to Compete shall be amended as follows:

1.      Section 1 of the Covenant Not to Compete is hereby deleted in its entirety and replaced with the following:

N:\DOCS\05275\11385\10040003.DOC

Covenants.

(a)     Heinzel covenants and agrees that, from and after the date hereof until January 28, 2010, he will neither directly or indirectly manage, own or operate a business engaged in the wholesale distribution of discount tools, baseball hats and other "close-out" items currently distributed by JMK (other than (i) sunglasses and reading glasses and (ii) other novelty items that are not being currently distributed by JMK) to customers located within the United States.

(b)     The parties acknowledge and agree that, notwithstanding anything to the contrary contained herein, Heinzel may manage, own, operate, consult with or for, be employed by or otherwise be engaged in any capacity in connection with any business engaged in the sale and/or distribution of (i) sunglasses and reading glasses and (ii) novelty items other than those novelty items and items reasonably related thereto that are being currently distributed by JMK, and that such items are specifically exempted from the prohibition on competition otherwise contained herein.

2.     This Amendment, along with the surviving terms of the Covenant Not to Compete represents the entire agreement of Heinzel, JMK and IIT with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date and year first above written.

JMK SALES, INC.

By:_____
Authorized Agent
Print Name:_____
Title:_____

ROBERT HEINZEL

ILLINOIS INDUSTRIAL TOOL, INC.

By:_____
Authorized Agent
Print Name:_____
Title:_____

# EXHIBIT G

 **Taiwan Bob's**  # LED CLOSEOUT

Diamond Visions Inc.                    ## Items will go fast, so buy now!!!

 **2pk LED NIGHT LIGHT**
Item #:LED-0182

Org. price : $2.40
PK:24
**75¢**

 **MEGA HANDY LED LIGHT**
Item #: FL-M08

Org. price : $6.97
PK:20
**$3.97**

 **LED PICK UP TOOL**
Item #: 0174

Org. price : $2.97
PK:24
**75¢**

 **8 in 1 SCREW-DRIVER LED**
Item #: LED-0156

Org. price : $5.97
PK: 16
**$3.97**

 **16ft LED TAPE MEASURE**
Item #: LED-1485

Org. price : $2.97
PK: 20
**$1.80**

 **360 CLIP LED LIGHT**
Item #: LED-1508

Org price : $1.25
PK: 48
**75¢**



 **BENDABLE LED LASER PEN**
Item #: LED-0153

Org. price : $2.97
PK: 24
**$1.97**

 **LED DRAWER LIGHT**
Item #: LED-0167

Org. price : $2.40
PK: 14
**75¢**

 **21" LONG BENDABLE LED**
Item #: LED-0160

Org. price : $2.97
PK: 24
**$1.50**



 **LED SCREWDRIVER**
Item #: LED-1478

Org. price : $2.40
PK: 24
**75¢**

 **LED CLIP PEN**
Item #: LED-0157

Org. price: $1.97
PK: 24
**75¢**

 **LED MINI SCREWDRIVER**
Item #: LED-1515

Org. price: $2.50
PK: 20
**75¢**

 ## Diamond Visions Inc.
**9817 South 13th Street**
**Oak Creek, WI 53154**

**Phone number:** (866) 965-0700
**Fax number:** (866) 600-0722




Mid Vision... **Lawn and Garden Summer Specials 2008**

**Pruning Shears**
PK: 12/48
**$1.97**
Item #: XS-78436968

**Grass Shears**
PK: 12/48
**$1.97**
Item #: XS-92126968

**Butterfly Net**
PK: 48
**75¢**
Item #: D-0120

**Aluminum Garden Tools**
PK: 36
**$2.40**
Item #: CRAFT-ASST

**6pk Votive Citronella Candles**
PK: 24/72
**75¢**
Item #: FE-KCV-12

**6" Glow Stick**
Item #: GL-0105
PK: 48
**65¢**

**15" Glow Stick**
Item #: GL-0106
PK: 36
**$1.49**

**24" H.D Bungee Cord**
PK: 36          .48"
Item #: SON-BSC24/48/72   72"
**60¢ 65¢ 75¢**

**3 x 60 Duct Tape**
PK: 16
**$3.50**
Item #: TA-0002

**Tweezer Asst.**
PK:40
**97¢**
Item #: DON-1227

**26ft Heavy Duty Dog Leash**
PK: 6
**$2.40**
Item #: SON-24917

**Mini Crank LED**
PK: 50
**$1.50**
Item #: KC-0101

**Puffer Ball**
PK: 12
**75¢**
Item #: TOY-211




# Diamond Visions Inc.
9817 South 13th Street
Oak Creek, WI 53154

Phone number: (866) 965-0700
Fax number: (866) 600-0722

www.diamond-visions.com

# Taiwan Bob's Gloves Galore

Diamond Visions Inc.



**2 Pack Brown Jersey Glove**
Item #: GL-4503-2pk
PK: 50/100
**65¢**



**2 Pack Rubber Dot Glove**
Item #: GL-4715-N
PK: 50/100
**65¢**



**6 Pack Brown Jersey**
Item #: GL-4503-6pk
PK: 50
**$1.80**



**Plain Camo Glove**
Item #: GL-4506P
PK: 72/144
**55¢**



**Camo Rubber Dot Glove**
Item #: GL-4506
PK: 72/144
**60¢**



**Ladies Garden Glove**
Item #: GL-9120
PK: 144
**49¢**



**Leather Palm**
Item #: GL-3280Q
PK: 60/120
**65¢**



**Pig Skin Glove**
Item #: GL-7017
PK: 72
**$1.97**



**Red Lined Brown Jersey**
Item #: GL-4308Q
PK: 60/120
**65¢**



**Red Lined Leather Palm Glove**
Item #: GL-3685
PK: 36/72
**$1.80**



**Single Pair Brown Jersey Glove**
Item #: GL-4503
PK: 300
**32¢**



**Single Pair Rubber Dot**
Item #: GL-4715Q
PK: 300
**39¢**



**FREE!!** 36 Pair of Brown Jersey Gloves with $250 Glove Order     **FREE!!** 72 Pair of Brown Jersey with $500 Glove Order



## Diamond Visions Inc.
**9817 South 13th Street**
**Oak Creek, WI 53154**

**Phone number:** (866) 965-0700
**Fax number:** (866) 600-0722

www.diamond-visions.com



  **Tiawan Bob's**  # Lighters

**Diamond Visions Inc.**



**Duel Led Lighter**

**PK: 24**

Item #: LI-7971

**$2.25**



**Fishing Lure LED Lighter**

**PK:16**

Item #: LI-8324

**$2.25**



**Triple Torch Lighter**

**PK:16**

Item #: LI-9170

**$2.25**



**CLOSE OUT!**

**Large Tractor Lighter**

**PK: 6**

Item #: LI-9176

 **$2.25**



**Magazine Clip Lighter**

**PK: 16**

Item #: LI-60486

  **$2.25**



**Bag of Money Lighter**

**PK: 18**

Item #: LI-9163

 **$2.25**



**Bowling Pin Lighter**

**PK: 16**

Item #: LI-7823

 **$2.25**



**Deer Head Lighter**

**PK: 16**

Item #: LI-8867

 **$2.25**



**Diamond Lighter**

**PK: 12**

Item #: LI-8512

**$2.25**



**Fire Extinguisher Lighter**

**PK: 12**

Item #: LI-00803L

**$2.25**



**Flashlight Lighter**

**PK: 25**

Item #: LI-9239

**97¢**



**Flex Head Torch Lighter**

**PK: 24**

Item #: LI-2028

**$2.25**

 

# Diamond Visions Inc.

**9817 South 13th Street Oak**

Phone number: (866) 965-0700
Fax number: (866) 600-0722

www.diamond-visions.com

# EXHIBIT H

(Dealer-Keep this side for your Records)

**Diamond Visions**
**Drop Ship Pallets**

Booth No
5725          0010023
**Diamond Visions**

## Buyer's Choice

Freight Terms
PRE-PAID
Payment Terms
30 DAYS

INSTRUCTIONS TO DEALER
1.CONTACT THE FACTORY DIRECTLY FOR ALL INQUIRES
INCLUDING DELIVERY DATE, PRICING, ETC.
2.PRICES QUOTED DO NOT INCLUDE ADDERS

| Total pallet Quantity | 36 |
|---|---|

Number of pallet(s)
Ordered_____    PO #_____

Total Pallet
Regular Price
$252.000

Total Pallet
Special Price
$178.920

Savings
29.00%

36 EACHES LED WORK LIGHT
24 LED WORK LIGHT
Factory No. - FL-9R , UPC- 856434001188
Regular Cost $7.000    Special Cost $4.970

(Dealer-Keep this side for your Records)
Form No.:6, Vendor:Diamond Visions, Pallet No.: PLT1570,
Booth No.: , Buyer:Karen Bauer, Department:Housewares
Page 1 of 1

---

(Vendor side-Leave in box provided)
Diamond Visions
Drop Ship Pallets

BOOTH # 5725          0010023
Vendor Name: Diamond Visions

Place Dealer Label Here

**Buyer's Choice**
Freight Terms
PRE-PAID
Payment Terms
30 DAYS

INSTRUCTIONS TO MANUFACTURER
1.SHIP ORDER DIRECTLY TO DEALER INDICATED IN THE
SHIP TO ADDRESS DO NOT SHIP TO ORGILL, INC.
2.INVOICE IN DUPLICATE TO ORGILL, INC.
DO NOT SEND INVOICE TO DEALER
3.INVOICE MUST SHOW ORGILL PURCHASE ORDER
NUMBER TO BE ACCEPTED FOR PAYMENT

| Total pallet Quantity | 36 |
|---|---|

Number of pallet(s)
Ordered_____
PO #_____

Total Pallet
Regular Price
$252.000

Total Pallet
Special Price
$178.920

Savings
29.00%

36 EACHES LED WORK LIGHT
24 LED WORK LIGHT
Factory No. - FL-9R , UPC- 856434001188
Regular Cost $7.000    Special Cost $4.970

(Vendor side-Leave in box provided)
Form No.: 6, Pallet No.: PLT1570, Booth No.: ,
Vendor: Diamond Visions,
Buyer:Karen Bauer, Housewares
Page 1 of 1

(Dealer-Keep this side for your Records)

**Diamond Visions**
**Drop Ship Pallets**

Booth No
*5125*    0010023
**Diamond Visions**

# Buyer's Choice

**Freight Terms**
PRE-PAID
**Payment Terms**
30 DAYS
**INSTRUCTIONS TO DEALER**
1.CONTACT THE FACTORY DIRECTLY FOR ALL INQUIRES
INCLUDING DELIVERY DATE, PRICING, ETC.
2.PRICES QUOTED DO NOT INCLUDE ADDERS

| Total pallet Quantity | 72 |
|---|---|

Number of pallet(s)
Ordered_____  PO #_____

| Total Pallet Regular Price $288.000 | Total Pallet Special Price $213.840 | Savings 25.75% |
|---|---|---|

**72 EACHES LASER BENDABLE**
**LASER BENDABLE LED**
**Factory No. - LED-0012 , UPC- 856434001232**
**Regular Cost  $4.000    Special Cost $2.970**

---

(Vendor side-Leave in box provided)
**Diamond Visions**
**Drop Ship Pallets**
BOOTH # *5125*    0010023
**Vendor Name: Diamond Visions**

Place Dealer Label Here

**Buyer's Choice**
**Freight Terms**
PRE-PAID
**Payment Terms**
30 DAYS
**INSTRUCTIONS TO MANUFACTURER**
1.SHIP ORDER DIRECTLY TO DEALER INDICATED IN THE
SHIP TO ADDRESS DO NOT SHIP TO ORGILL, INC.
2.INVOICE IN DUPLICATE TO ORGILL, INC.
DO NOT SEND INVOICE TO DEALER
3.INVOICE MUST SHOW ORGILL PURCHASE ORDER
NUMBER TO BE ACCEPTED FOR PAYMENT

| Total pallet Quantity | 72 |
|---|---|

Number of pallet(s)
Ordered_____
PO #_____

| Total Pallet Regular Price $288.000 | Total Pallet Special Price $213.840 | Savings 25.75% |
|---|---|---|

**72 EACHES LASER BENDABLE**
**LASER BENDABLE LED**
**Factory No. - LED-0012 , UPC- 856434001232**
**Regular Cost  $4.000    Special Cost $2.970**

(Dealer-Keep this side for your Records)

**Diamond Visions**
**Drop Ship Pallets**

Booth No
**5125**    0010023
**Diamond Visions**

**Freight Terms**
**PRE-PAID**
**Payment Terms**
**30 DAYS**
**INSTRUCTIONS TO DEALER**
1.CONTACT THE FACTORY DIRECTLY FOR ALL INQUIRES
INCLUDING DELIVERY DATE, PRICING, ETC.
2.PRICES QUOTED DO NOT INCLUDE ADDERS

| Total pallet Quantity | 144 |
|---|---|

Number of pallet(s)
Ordered_____  PO #_____

| Total Pallet Regular Price $158.400 | Total Pallet Special Price $129.600 | Savings 18.18% |
|---|---|---|

**144 EACHES MAG GLASS**
**MAGNIFYING GLASSSES IN DISPLAY**
Factory No. - MA-01 , UPC- 856434002218
Regular Cost $1.100    Special Cost $0.900

(Dealer-Keep this side for your Records)
Form No.:5, Vendor:Diamond Visions, Pallet No.: PLT1569,
Booth No.: , Buyer:Karen Bauer, Department:Housewares
Page 1 of 1

---

(Vendor side-Leave in box provided)
**Diamond Visions**
**Drop Ship Pallets**
BOOTH # **5125**    0010023
Vendor Name: Diamond Visions

Place Dealer Label Here

**Freight Terms**
**PRE-PAID**
**Payment Terms**
**30 DAYS**
**INSTRUCTIONS TO MANUFACTURER**
1.SHIP ORDER DIRECTLY TO DEALER INDICATED IN THE
SHIP TO ADDRESS DO NOT SHIP TO ORGILL, INC.
2.INVOICE IN DUPLICATE TO ORGILL, INC.
DO NOT SEND INVOICE TO DEALER
3.INVOICE MUST SHOW ORGILL PURCHASE ORDER
NUMBER TO BE ACCEPTED FOR PAYMENT

| Total pallet Quantity | 144 |
|---|---|

Number of pallet(s)
Ordered_____
PO #_____

| Total Pallet Regular Price $158.400 | Total Pallet Special Price $129.600 | Savings 18.18% |
|---|---|---|

**144 EACHES MAG GLASS**
**MAGNIFYING GLASSSES IN DISPLAY**
Factory No. - MA-01 , UPC- 856434002218
Regular Cost $1.100    Special Cost $0.900

(Vendor side-Leave in box provided)
Form No.: 5, Pallet No.: PLT1569, Booth No.: ,
Vendor: Diamond Visions,
Buyer:Karen Bauer, Housewares
Page 1 of 1

(Dealer-Keep this side for your Records)

**Diamond Visions**
**Drop Ship Pallets**

Booth No

0010023

**Diamond Visions**

## Buyer's Choice

**Freight Terms**
PRE-PAID
**Payment Terms**
30 DAYS
**INSTRUCTIONS TO DEALER**
1.CONTACT THE FACTORY DIRECTLY FOR ALL INQUIRES
INCLUDING DELIVERY DATE, PRICING, ETC.
2.PRICES QUOTED DO NOT INCLUDE ADDERS

| Total pallet Quantity | 240 |
|---|---|

Number of pallet(s)
Ordered_____  PO #_____

| Total Pallet Regular Price $228.000 | Total Pallet Special Price $180.000 | Savings 21.05% |
|---|---|---|

**240 EACHES AIM IN FLAME**
**AIM IN FLAME LIGHTER**
**Factory No. - LI-2007 , UPC-714638020070, SKU 2628089**
**Regular Cost $0.950        Special Cost $0.750**
**REG - VP1: $1.090  VP2: $1.050  ADV: $0.980**

(Dealer-Keep this side for your Records)
Form No.:9, Vendor:Diamond Visions, Pallet No.: PLT1573,
Booth No.: , Buyer:Karen Bauer, Department:Housewares
Page 1 of 1

---

(Vendor side-Leave in box provided)
Diamond Visions
**Drop Ship Pallets**

BOOTH #                                    0010023
Vendor Name: Diamond Visions

Place Dealer Label Here

**Buyer's Choice**
Freight Terms
PRE-PAID
Payment Terms
30 DAYS
INSTRUCTIONS TO MANUFACTURER
1.SHIP ORDER DIRECTLY TO DEALER INDICATED IN THE
SHIP TO ADDRESS DO NOT SHIP TO ORGILL, INC.
2.INVOICE IN DUPLICATE TO ORGILL, INC.
DO NOT SEND INVOICE TO DEALER
3.INVOICE MUST SHOW ORGILL PURCHASE ORDER
NUMBER TO BE ACCEPTED FOR PAYMENT

| Total pallet Quantity | 240 |
|---|---|

Number of pallet(s)
Ordered_____
PO #_____

| Total Pallet Regular Price $228.000 | Total Pallet Special Price $180.000 | Savings 21.05% |
|---|---|---|

240 EACHES AIM IN FLAME
AIM IN FLAME LIGHTER
Factory No. - LI-2007 , UPC-714638020070, SKU-
2628089
Regular Cost $0.950        Special Cost $0.750

(Vendor side-Leave in box provided)
Form No.: 9, Pallet No.: PLT1573, Booth No.: ,
Vendor: Diamond Visions,
Buyer:Karen Bauer, Housewares
Page 1 of 1

(Dealer-Keep this side for your Records)

**Diamond Visions**
Drop Ship Pallets

Booth No _5125_
0010023
Diamond Visions

**Freight Terms**
**200 PRE-PAID**
**Payment Terms**
**NET 30 DAYS**
**INSTRUCTIONS TO DEALER**
1.CONTACT THE FACTORY DIRECTLY FOR ALL INQUIRES
INCLUDING DELIVERY DATE, PRICING, ETC.
2.PRICES QUOTED DO NOT INCLUDE ADDERS

| Total pallet Quantity | 144 |
|---|---|

Number of pallet(s)
Ordered_____ PO #_____

| Total Pallet Regular Price | Total Pallet Special Price | Savings |
|---|---|---|
| $144.000 | $122.400 | 15.00% |

144 EACH PRO LINE PAINT BRUSHES
PRO LINE NATURAL HANDLE PAINT BRUSHES 1, 1.5, 1.5A, 2, 2.5, 3
Factory No. - PT-PRO , UPC- 856434001263
Regular Cost $1.000          Special Cost $0.850

---

(Vendor side-Leave in box provided)
**Diamond Visions**
**Drop Ship Pallets**
BOOTH # _5125_          0010023
**Vendor Name: Diamond Visions**

Place Dealer Label Here

Freight Terms
200 PRE-PAID
Payment Terms
NET 30 DAYS
INSTRUCTIONS TO MANUFACTURER
1.SHIP ORDER DIRECTLY TO DEALER INDICATED IN THE
SHIP TO ADDRESS DO NOT SHIP TO ORGILL, INC.
2.INVOICE IN DUPLICATE TO ORGILL, INC.
DO NOT SEND INVOICE TO DEALER
3.INVOICE MUST SHOW ORGILL PURCHASE ORDER
NUMBER TO BE ACCEPTED FOR PAYMENT

| Total pallet Quantity | 144 |
|---|---|

Number of pallet(s)
Ordered_____
PO #_____

| Total Pallet Regular Price | Total Pallet Special Price | Savings |
|---|---|---|
| $144.000 | $122.400 | 15.00% |

144 EACH PRO LINE PAINT BRUSHES
PRO LINE NATURAL HANDLE PAINT BRUSHES 1,
1.5, 1.5A, 2, 2.5, 3
Factory No. - PT-PRO , UPC- 856434001263
Regular Cost $1.000          Special Cost $0.850

---

# EXHIBIT I



# JMK/DIAMOND VISIONS
## PREMIUM SUNGLASSES & READING GLASSES!

**NOW IN ALL ACE RSC**

YOUR COST IS **$1.49** EACH

**PACKED 72 PIECE ASSORTMENT**

## CHOOSE YOUR RETAIL TAG

| | |
|---|---|
| **2.99 SUNGLASS TAG PK-72** Ace Number **6121420** | **3.99 SUNGLASS TAG PK-72** Ace Number **6121412** |
| **2.99 READERS TAG PK-72** Ace Number **6121214** | **3.99 READERS TAG PK-72** Ace Number **6121206** |

**BOOTH #4944**

# SUNGLASSES



**$1⁴⁹ COST**
$2.99 or $3.99 Retail

**Web Site!** diamond-visions.com

- UV Protection
- $8 To $15 Retail Values
- One Bar Code For All Glasses
- Contact Diamond-Visions For Rack Information

# READER GLASSES



**$1⁴⁹ COST**
$2.99 or $3.99 Retail

- Current Styles
- 1.00 To 4.00 Diopter
- $8 To $15 Retail Values
- One Bar Code For All Glasses



**NOW** In Ace Warehouse Ace Order Number **9094566**

**ThinLine**
- Ultra-Thin Styling
- Spring Temple Comfort
- Protective Carry Case

Pack 30 **$1⁶⁶ COST**

Store # _____ P.O. # _____

9817 South 13th Street, Oak Creek, WI 53154 **(866) 965-0700** fax **(866) 600-0722**

LED008    *Sunglasses Reading Glasses Novelties*    www.diamond-visions.com



Booth #4944



# FREE 36 Pack LED KEY CHAINS
## With purchase of 5 displays



**28 LED** — FL28R — $6.97 — PK 20 — Order ___

**5 Mega LED Key Chain** — KC-0004 — $1.97 — PK 48 — Order ___

**LED Bike Light** — LED-0166 — $2.97 — PK 16 — Order ___

**LED/Laser Key Chain** — $1.97 — PK 48 — KC-2010 — Order ___

**LED Pig Key Chain** — KC-0171 — 75¢ — PK 60 — Order ___

**14 LED** — $4.50 — PK30 — FL14R — Order ___

**4 LED Tap Light** — LED-0168 — $1.50 — PK 18 — Order ___

**9 LED UV Decto-Light** — LED-0175 — $3.97 — PK 12 — Order ___

**Dual Buckle LED** — LED-0172 — $1.25 — PK 24 — Order ___

**Round Silver Key Chain** — KC-0164 — 75¢ — PK 72 — Order ___

**LED Hammer Wrench** — LED-0161 — PK 18 — $4.97 — Order ___

**Wind Up Flashlight** — LED-0170 — $3.95 — PK 12 — Order ___

**Super LED Miracle Light** — LED-0173 — $5.97 — PK 12 — Order ___

**72 Pc. Paint Brush Asst.** — 75¢ — PT-PRO — PK 72 — Order ___

**3 lb LED Pick Up Tool** — LED-0174 — PK 24 — $2.40 — Order ___

**Flat LED/ Laser Pointer** — LED-0165 — PK 24 — $2.40 — Order ___

Store # _____     P.O. # _____



9817 South 13th Street, Oak Creek, WI 53154  **(866) 965-0700** fax **(866) 600-0722**

LED008     *Sunglasses Reading Glasses Novelties*                    www.diamond-visions.com

# NEW COLLECTOR LED FLASHLIGHTS!




| Order | Item | Pack | Cost |
|---|---|---|---|
| _____ | 9 LED Collector Flashlight | 30 PK | **$3.50** |
| _____ | 8 LED w/Laser Collector Flashlight | 30 PK | **$4.50** |
| _____ | 28 LED Collector Flashlight | 20 PK | **$6.97** |
| _____ | 9 LED Camouflage Collector Flashlight | 15 PK | **$3.50** |
| _____ | 9 LED POW Collector Flashlight | 15 PK | **$3.50** |
| _____ | 9 LED NASCAR Collector Flashlight | 15 PK | **$3.50** |





**COME SEE Sample of Christmas! 99¢ & up PALLET PROGRAM**

Store # _____  P.O. # _____

9817 South 13th Street, Oak Creek, WI 53154  **(866) 965-0700** fax **(866) 600-0722**

LED008  *Sunglasses Reading Glasses Novelties*  www.diamond-visions.com

Ace Hardware Outlet

Page 1 of 3



**ΛϹ∃** *Hardware*

Operated by  AG Lock & Hardware  An Ace Hardware Dealer in NYC
Shipping from Warehouses across US  1-(212)-400-7488 or 1-(800)-985-6017

↳ **View Cart**

**Feedback on EBay**  **Gift Certificates**
[                    ] **GO**

Sign In  |  Order Status  |  Browse By Manufacturer  |  Browse By Brand  |  Browse By Category  |  View Rebate Products  |  Contact Us

[          ] **Search**

Search Results for "JMK-ROBERT HEINZEL"

**40** Items found

Showing 1 of 4 pages.

Items Per Page: [10]

☐ Hide Filter   ☐ Hide Images

Result Page:  **1 2 3 4**   Next

Filter By: Manufacturer: [Select Manufacturer ▾] **go**   Category: [Select Category ▾] **go**   Search with in your Results: [          ] **go**

| Description | | Model# | Manufacturer | Price |
|---|---|---|---|---|
| CD WALLET SKU: 6115174 | | 02000 | JMK-ROBERT HEINZEL | $1.34 |
| DELUX PEN ASSORTMENT 5PC SKU: 6114862 | | 05012 | JMK-ROBERT HEINZEL | $1.29 |
| SELF STICK MEMO PADS SKU: 6114870 | | 05020 | JMK-ROBERT HEINZEL | $0.89 |

http://www.acehardwareoutlet.com/(xln4yr45rmlpfy45albotvrh)/SearchResults.aspx?manufacturer=34019

3/12/2008

Page 2 of 3

Ace Hardware Outlet

| Image | Product | | SKU | Manufacturer | Price |
|---|---|---|---|---|---|
|  | JUMBO CRAYONS 24 COUNT | SKU: 6129704 | 08139 | JMK-ROBERT HEINZEL | $1.49 |
| No Image | MAGNIFYING GLASS 60MM 2PC | SKU: 6115117 | 90790 | JMK-ROBERT HEINZEL | $1.29 |
|  | GLOW STICK 6 BRACELETS | SKU: 6115059 | 09500 | JMK-ROBERT HEINZEL | $1.16 |
|  | FOAM BRUSH 10PC | SKU: 6115075 | 20950 | JMK-ROBERT HEINZEL | $1.34 |
|  | "MULTI-USE HOUSEHOLD" FRESH WIPES 8PK | SKU: 6114771 | 01040 | JMK-ROBERT HEINZEL | |

Page 3 of 3

Ace Hardware Outlet

| | HOME & AUTO DUST MAP<br>SKU: 6114730 | 00010 | JMK-ROBERT HEINZEL | $0.89 |
| | "AID+PLUS" COMFORTABLE BANDAGES<br>SKU: 6115168 | 06682 | JMK-ROBERT HEINZEL | $1.34 |

*(price $1.29 appears at top of second row area)*

40 Items found    Result Page:   1 2 3 4   Next    Showing 1 of 4 pages.

**Disclaimer:-** Price data might delayed by five business days Data is provided above is provided by our search engine software and it will be delayed for all new information. Please click on the actual product to view the most current data.

**We ship within US, Canada, Europe and Internationally**

About Us | Terms And Conditions | Shipping from Warehouse across US | Returns Policy | Privacy Statement | Having Problems with our Shopping Cart?

We are an authorized Ace Hardware Dealer shipping from Warehouses across the US.    If you need assistance with ordering or experiencing website problems please email us at
 sales@acehardwareoutlet.com

Copyright 2002 - 2008. All rights reserved.

http://www.acehardwareoutlet.com/(xln4yr45mlpfy45albotvrh)/SearchResults.aspx?manufacturer=34019

3/12/2008

## PROOF OF SERVICE

I, Christopher T. Sheean, an attorney, on oath affirm that all parties of record have been provided copies of this **Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Injunction** and the above-named document, by ( )   Hand delivery ( ) Facsimile ( X ) U.S. Mail located at 225 W. Wacker Drive, Chicago, Illinois 60606, before 5:00 p.m. on this **27th day of March, 2008.**

[X] Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.


**/s/ Christopher T. Sheean**

1865880-1